885 F.2d 918
 30 ERC 1250, 280 U.S.App.D.C. 296, 19
Envtl. L. Rep. 21,409
 HAZARDOUS WASTE TREATMENT COUNCIL
v.
Lee M. THOMAS, Administrator and U.S. Environmental
Protection Agency.
CHEMICAL MANUFACTURERS ASSOCIATION
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY.
CHEMICAL WASTE MANAGEMENT, INC.
v.
U.S. ENVIRONMENTAL PROTECTION AGENCY and Lee H. Thomas, Administrator.
 Nos. 87-1492, 87-1545.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 22, 1989.
Decided Sept. 15, 1989.
 
 David R. Case, with whom Ridgway M. Hall, Jr., Washington, D.C., was on the brief, for Hazardous Waste Treatment Council, petitioner in No. 87-1492 and intervenor in No. 87-1545 and No. 87-1546.
 Mary Elizabeth Ward, Attorney, Dept. of Justice, with whom Roger J. Marzulla, Asst. Atty. Gen., and Steven E. Silverman, Attorney, E.P.A., and Lawrence Jensen, General Counsel, E.P.A., Washington, D.C., were on the brief, for respondents. Lisa F. Ryan, Washington, D.C., also entered an appearance for respondent.
 
 
 1
 William R. Weissman and Douglas H. Green, Washington, D.C., entered appearances for intervenor The Edison Elec. Institute, et al., in No. 87-1492 and No. 87-1545.
 
 
 2
 G. William Frick, Arnold S. Block, and Thomas S. Llewellyn, Washington, D.C., entered appearances for intervenor American Petroleum Institute.
 
 
 3
 John T. Smith II, Washington, D.C., entered an appearance for Chemical Mfrs. Ass'n, petitioner in No. 87-1545 and intervenor in No. 87-1492. David F. Zoll and Kenneth M. Kastner, Washington, D.C., entered appearances for Chemical Mfrs. Ass'n., intervenor in No. 87-1492.
 
 
 4
 Angus Macbeth and Monica Schwebs, Washington, D.C., entered appearances for Chemical Waste Management, Inc., petitioner in No. 87-1546.
 
 
 5
 Before WALD, Chief Judge, and SILBERMAN and D.H. GINSBURG, Circuit Judges.
 
 
 6
 Opinion for the court filed by Circuit Judge D.H. GINSBURG.
 
 
 7
 Dissenting opinion filed by Chief Judge WALD.
 
 D.H. GINSBURG, Circuit Judge:
 
 8
 The Hazardous Waste Treatment Council petitions for review of the so-called California List rule promulgated by the Environmental Protection Agency pursuant to Sec. 3004(d) of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. Secs. 6901, et seq., as amended by the Hazardous and Solid Waste Amendments of 1984 (HSWA). Subtitle C of RCRA, as thus amended, establishes a "cradle-to-grave" regulatory structure for the safe treatment, storage, and disposal of hazardous wastes.
 
 
 9
 HWTC here alleges that the California List rule is inconsistent with RCRA's scheme in three respects: first, that the rule fails to fulfill an alleged statutory duty to lower the maximum permissible concentrations of California List wastes[1] in substances subject to land disposal; second, that it impermissibly permits California List wastes that have been solidified to escape the reach of the land disposal prohibitions; and third, that it facilitates evasion of those prohibitions by permitting a waste generator to send its wastes directly to a land disposal facility (rather than first to a treatment facility) based upon the generator's knowledge that the waste does not contain prohibited levels of California List constituents.
 
 
 10
 HWTC is "a national trade association of over 65 commercial firms that use advanced and established treatment technologies for the management of hazardous waste, and supporting equipment manufacturers." The Council contends that it has standing as a representative of its member companies under Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), in which the Supreme Court held thatan association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim nor the relief requested requires the participation of individual members in the lawsuit.
 
 
 11
 EPA does not dispute, nor do we have any basis upon which to doubt, that HWTC satisfies the latter two of these three requirements for representational standing. Whether any of HWTC's members would have standing to raise the claims presented here, however, is disputed on both prudential and constitutional grounds.
 
 
 12
 Because we conclude that HWTC lacks prudential standing to pursue these claims, we dismiss the petitions for review without reaching either the constitutional standing question or the merits.[2]
 
 I. THE PRUDENTIAL STANDING TEST APPLIES
 
 13
 Whether the doctrine of prudential standing so operated as to preclude HWTC from challenging other EPA decisions under RCRA was much mooted in two recent cases--Hazardous Waste Treatment Council v. EPA (HWTC II), 861 F.2d 277, 284 (D.C.Cir.1988) and Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433 (D.C.Cir.1989). In this case, however, the Council claims for the first time that the doctrine is not even applicable in RCRA cases, on the ground that the broad judicial review provision in the statute simply does not admit of any prudential limitation. HWTC argues, in other words, that Congress has directed the courts to review EPA action under RCRA at the instance of any litigant who satisfies the requirements for constitutional standing. It cites for this proposition Center for Auto Safety v. NHTSA (CAS I), 793 F.2d 1322, 1337 (D.C.Cir.1986), in which we held that the judicial review provision of the Energy Policy and Conservation Act of 1975 (EPCA) "clearly removes the judicial authority to create prudential barriers by granting review of agency action to those 'who may be adversely affected' " by such action.
 
 
 14
 That decision is not controlling here, however. Section 702 of the Administrative Procedure Act provides for judicial review at the behest of any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," 5 U.S.C. Sec. 702, and the Supreme Court has repeatedly held, both before and after CAS I, that prudential limitations apply to review of agency action under that section. See, e.g., Clarke v. Securities Industry Association, 479 U.S. 388, 394-96, 107 S.Ct. 750, 754-56, 93 L.Ed.2d 757 (1987); Association of Data Processing Service Orgs., Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). Because RCRA specifically provides, with exceptions not here relevant, that "[a]ny judicial review of final regulations promulgated [pursuant to its terms] ... shall be in accordance with [inter alia, APA Sec. 702]," 42 U.S.C. Sec. 6976(a), the Supreme Court's interpretation of that provision is inescapably applicable to this case. Even if CAS I retains its vitality as an interpretation of EPCA despite the facial similarity of the review provisions in that statute and in the APA, that case is plainly not applicable to review of an EPA action under RCRA. Thus, prudential limitations apply to the case before us.
 
 II. THE PRUDENTIAL STANDING TEST APPLIED
 
 15
 Despite the complexity it sometimes generates in application, the theory underlying prudential standing doctrine is elegant in its simplicity. At base, it proceeds from a single observation about the legislative process: Congress often fails to specify who may and who may not invoke the power of the courts to enforce the terms of a statute. It follows that the judiciary has to supply a principle by which to infer Congress's intent on that often critical question. The zone of interests test is the result. See, e.g., Clarke, 479 U.S. at 400, 107 S.Ct. at 757-58 (zone test is, "at bottom," an inquiry into congressional intent). That test requires that we ask whether a would-be challenger to agency action is pursuing an interest "arguably within the zone of interests" Congress intended either to regulate or to protect. Data Processing, 397 U.S. at 153, 90 S.Ct. at 829-30.
 
 
 16
 The fundamental, and unexceptionable, idea behind that test is a presumption that Congress intends to deny standing to "those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. As a general matter, there are two types of parties with the right incentives to police an agency's enforcement of the laws it administers. First, those whom the agency regulates have the incentive to guard against any administrative attempt to impose a greater burden than that contemplated by Congress. Second, those whom the agency was supposed to protect have the incentive to ensure that the agency protects them to the full extent intended by Congress. See, e.g., id. at 397, 399, 107 S.Ct. at 756, 757.
 
 
 17
 HWTC contends that it has standing both as a regulated party and as an interest group Congress sought to protect. We address these arguments in turn.
 
 A. Regulated Interests
 
 18
 HWTC initially argues that the California List rule burdens its members who operate treatment facilities at least insofar as EPA has approved of solidification as a method of avoiding the limitations on land disposal of liquid wastes. As a consequence, it predicts that its members will be forced by competitive market conditions to offer solidification services to their customers, which will in turn increase the members' exposure to EPA penalties because solidification is allegedly insufficient adequately to reduce the mobility of hazardous constituents in the waste. In essence, HWTC wants EPA to prohibit its members from using this relatively low-technology treatment approach so that they can sell more of their high-technology services.
 
 
 19
 Assuming that HWTC accurately anticipates how the interplay of market forces and the regulatory regime will work out, its members still are not "regulated" in the relevant sense. "A party is 'regulated' for purposes of the 'zone' test only if it is regulated by the particular regulatory action being challenged." HWTC II, 861 F.2d at 284. It is most decidedly not "regulated" for such purposes when its challenge is based upon the agency's failure to constrain it by law. While it is often said that "competition is the best regulator," it would be a mere play on words to say that a firm is "regulated" and thus has standing to sue when it has only been remitted to the constraining force of the competitive market place.
 
 B. Protected Interests
 
 20
 We are left with the question whether the interests of the firms on behalf of which HWTC sues are arguably within the zone of interests Congress intended to protect. The Supreme Court has identified two ways in which a putative challenge may show that it is within the protected zone. Most obviously, a party is within that zone if it is among those whom Congress expressly or directly indicated were the intended beneficiaries of a statute. Also included within that zone, however, are parties whose interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests. As the Supreme Court put it, "the concern that the plaintiff be 'reliable' carries over to the 'zone of interest' inquiry, which seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. Thus, in order to have standing, a non-beneficiary must show "less than a ... congressional intent to benefit but more than a 'marginal[ ] rela[tionship]' to the statutory purpose." HWTC II, 861 F.2d at 283. Having done so, they may be regarded as "suitable challengers" of agency action, and as such, have standing under the zone of interests test. Id. at 283 (citing Haitian Refugee Center v. Gracey, 809 F.2d 794, 812-13 (D.C.Cir.1987).
 
 
 21
 HWTC alleges that it has standing to raise at least some of its claims on each of these two bases, which we take up in turn.
 
 1. Intended Beneficiaries
 
 22
 Congress's purpose in enacting HSWA is amply summarized in the legislative history to which HWTC points; the following passage from the Conference Report is illustrative:
 
 
 23
 [T]he Conferees intend to convey a clear and unambiguous message to the regulated community and the Environmental Protection Agency: reliance on land disposal of hazardous waste has resulted in an unacceptable risk to human health and the environment. Consequently, the Conferees intend that through the vigorous implementation of the objectives of this Act, land disposal will be eliminated for many wastes and minimized for all others, and that advanced treatment, recycling, incineration and other hazardous waste control technologies should replace land disposal. In other words, land disposal should be used only as a last resort and only under conditions which are fully protective of human health and the environment.
 
 
 24
 H.R.Rep. No. 1133, 98th Cong. 79, 80-81, reprinted in 1984 U.S.Code Cong. & Admin. News, 5576, 5649. Congress intended HSWA, in other words, to protect human health and the environment from what it found to be an unacceptable danger, and the primary means it chose to accomplish this end was the increased use of advanced treatment technologies such as those provided by HWTC's members.
 
 
 25
 HWTC therefore claims that its member treatment firms are among Congress's intended beneficiaries (with the result that it has standing to pursue those of its claims that advance the interests of treatment firms). As HWTC portrays the legislative history, Congress evinced an intent not only to eradicate threats to human health and to the environment, but also to improve the business opportunities of treatment firms. We faced precisely that claim, however, in HWTC II and again in Petro-Chem, and we rejected it in both cases. HWTC II, 861 F.2d at 282-85; Petro-Chem, 866 F.2d at 434-36. Compare Supplemental Brief of Petitioner ... Concerning "Prudential Standing" at Appendix B (quoting H.R.Rep. No. 1133 at 80; S.Rep. No. 284, 98th Cong. 6 (1983); and H.R.Rep. No. 198, 98th Cong. 32, reprinted in 1984 U.S.Code Cong. & Admin. News 5576) with Petro-Chem, 866 F.2d at 436 n. 3 (quoting same).
 
 
 26
 This identity of authority is understandable in that Petro-Chem involved a challenge to other subsections of the same section of RCRA as does this case. Although HWTC does, in its supplemental brief, assert that the legislative history is somehow more compelling as to the provisions involved here, it provides no explanation for its assertion, and the only additional passages it presents are various floor statements that mirror the above-referenced committee reports. None supports any distinction between Congress's intent with respect to the subsections at issue here and those of relevance in Petro-Chem, and none adds any further support to HWTC's case than do the committee reports, HWTC's claims for which we have already considered and rejected.
 
 
 27
 As we said in HWTC II,
 
 
 28
 [w]henever Congress pursues some goal, it is inevitable that firms capable of advancing that goal may benefit.... [A] rule that gave any such plaintiff standing merely because it happened to be disadvantaged by a particular agency decision would destroy the requirement of prudential standing....
 
 
 29
 861 F.2d at 283. Nor does it matter that Congress explicitly mentioned the means by which its end is to be accomplished. If Congress mandates that a particular method be used to achieve its goals, it may do so because that is the most effective (or cost-effective) manner of achieving that end, or for any other reason that commends itself to the legislators. But absent evidence to the contrary, we cannot rationally infer that Congress thereby makes benefitting the firms that provide the means an end in itself.
 
 
 30
 Because HWTC provides no persuasive basis upon which this case can be distinguished, we again hold, as we must, that its asserted competitive injuries are insufficient to confer prudential standing upon it.
 
 2. Suitable Challengers
 
 31
 As we have said, HWTC may still have representational standing if any of its members, while not a direct or express object of Congressional beneficence, is a "suitable challenger" to EPA's decision implementing RCRA. In order to determine whether the interests of HWTC's member firms coincide--i.e., systematically, not fortuitously--with the interests of those whom Congress intended to protect, we must, of course, consider what the interests of those firms are.
 
 
 32
 HWTC argues its case for standing in terms of the interests that its member firms are assertedly pursuing in this specific case. Accordingly, it claims first that EPA's alleged regulatory laxity will hurt the competitive position of HWTC member companies engaged in the waste treatment business. Were EPA to lower the permissible concentration levels for California List wastes, that is, generators of hazardous waste would have greater need to treat their wastes prior to disposal, and the member treatment firms would gain economically by providing the required treatment.
 
 
 33
 HWTC's second allegation is that EPA's actions affect the "consumer environmental interests" of its member land disposal facilities, in that waste generators will send to the disposal site, for example, a California List waste that is "merely solidified." Because EPA has not required the waste to meet more stringent treatment standards, we are told, the likelihood that the waste will migrate from the waste disposal site into the surrounding environment and the severity of the consequences of such migration will be greater than they would be had EPA fulfilled its statutory duty. Thus will member facilities be subject to an increased risk of liability for "clean-up costs, damages and regulatory penalties."[3]
 
 
 34
 a. The Treatment Firms' "Competitor" Claims
 
 
 35
 We have already held that the treatment firms are not among Congress's intended beneficiaries. HWTC claims, however, that as the chosen instrument for achieving Congress's goal in RCRA, those firms are nonetheless suitable challengers because their interests are so likely to coincide with the interests of those who are beneficiaries of the statute. This claim flies in the face of common sense.
 
 
 36
 HWTC represents, with respect to its "competitor" claims, treatment firms. The ultimate interest of those firms is in making money, of course. Their immediate interest is in more stringent treatment standards, on the theory that such standards will result in their selling more treatment services, which will, in turn, generate more earnings. But there is not the slightest reason to think that treatment firms' interest in getting more revenue by increasing the demand for their particular treatment services will serve RCRA's purpose of protecting health and the environment. Every merchant wants to maximize its earnings, and any merchant will, to the extent practicable, steer its customers to those of its goods or services that generate the greatest profit margins. Thus, we would expect the treatment firms, like any other merchant, to pursue regulation that encourages the alternatives with the greatest profit potential at the expense of others (say, recycling or incineration) that might be less profitable.
 
 
 37
 This is not, moreover, the only way in which the firms' interests might differ from those Congress intended to protect. Faced with a similar challenge in HWTC II, we described as "perfectly plausible" the scenario that stricter EPA regulation of a particular substance "would have the boomerang effect of increasing illegal dumping and thus would result in net harm to the environment." 861 F.2d at 283. Similarly, stricter treatment standards for California List wastes might lead to the substitution of manufacturing methods that generate other, more dangerous but less strictly regulated wastes. Cf. HWTC II, 861 F.2d at 284. ("A regulatory extension sought by the competitor interests in the Council might benefit recyclers' profits (e.g., by forcing the use of more advanced recycling techniques) but harm the environment (because, for example, its costs might lead to substitution of more environmentally harmful fuels).").
 
 
 38
 Nor does the treatment firms' interest in even more demanding treatment requirements miraculously end at the point where the levels of hazardous constituents are entirely safe. The watchword of those firms must be, in short, that treatment is good and more treatment is better--whether the effect on health and the environment is good, bad, or indifferent. HWTC's claim to standing here is precisely analogous to a defense contractor's claim to standing under an appropriations law in order to challenge the Defense Department's decision to purchase one type of weapon rather than another. The interest of such a firm in profits is not limited by the public's need for its type of weapon, and notwithstanding the sometimes contrary impression one encounters, the annual defense appropriation is not passed in order to benefit defense contractors, benefit them though it may.
 
 
 39
 Because we have no way of knowing (short of deciding the merits of HWTC's claim) the extent to which HWTC's interest in more rigorous treatment standards will be likely to further rather than to frustrate Congress's interest in protecting human health and the environment, and because "judicial intervention may defeat statutory goals if it proceeds at the behest of interests that coincide only accidentally with those goals," HWTC II, 861 F.2d at 283, HWTC is without standing under Hunt.
 
 
 40
 As is apparent, in the foregoing analysis, we have asked not whether a particular case raises a suitable challenge, but whether the interests of the particular party make it suitable to raise that challenge. Perhaps because this distinction was not consequential in the cases it has decided, the Supreme Court has sometimes spoken of the suitably of the challenge, sometimes of that of the challenge it brings. In both Clarke and Data Processing, for example, the Court treated the two approaches as if they were identical, variously describing the zone test in Clarke as an inquiry into whether the "would-be plaintiffs [are] 'arguably within the zone of interests ...' " and as an attempt to discern whether " 'the interest sought to be protected by the complainant [is] arguably within the zone of interests....' " 479 U.S. at 397, 396, 107 S.Ct. at 756, 755-56 (both quoting Data Processing ). See also Data Processing, 397 U.S. at 153, 157, 90 S.Ct. at 830, 831-32.
 
 
 41
 Although the Supreme Court has yet to rule on the question, we have no doubt that it is the interests that the challenger seeks to protect and not the challenge with which we must be concerned. As we have explained, the foundation underlying the zone of interests test is the notion that "those plaintiffs whose suits are more likely to frustrate than to further statutory objectives" should not be permitted to sue. Clarke, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12 (emphasis added). The standing requirement asks who may bring a particular challenge, not what particular challenges may be brought. The same claim may be viable in the hands of one challenger and not in those of another that, for example, has interests that make it less than "a reliable private attorney general to litigate the issue of the public interest in the ... case." Id. (quoting Data Processing, 397 U.S. at 154, 90 S.Ct. at 830). Thus, we have no doubt that injured environmental groups or landowners would have standing to pursue the very claims raised here. Significantly, however, they have not done so.
 
 
 42
 Moreover, were standing to depend upon the claim and not the claimant, the court would be required, in order to resolve that issue, to explore whether the challenge would further the goal of the statute. We would, in short, have to decide either the ultimate merit of the challenge ("whether petitioner's interpretation of the statute reflects congressional intent")--or at least a closely related question ("whether petitioner's interpretation of the statute would further Congress's purpose")--in order to decide the threshold standing question. As we proceed here, however, we avoid the necessity to decide the merits before we determine whether we should decide the merits. If the two issues were coextensive, the doctrine of prudential standing would be of no independent significance.
 
 
 43
 b. The Disposal Firms' "Consumer Environmental" Claims
 
 
 44
 HWTC's second claim of injury tracks a claim we heard on the merits in HWTC II, viz., that EPA's California List rule improperly permits land disposal, at its members' facilities, of inadequately treated wastes, thereby increasing the risk that such facilities will later be held liable for leakage. EPA responds that this claim is barred by our subsequent decision in Petro-Chem (which HWTC intimates was wrongly decided), where we held, on a constitutional ground, that HWTC lacked standing to raise a similar challenge. Because we conclude that this case is not controlled by HWTC II, and that the disposal firms lack prudential standing to raise their "consumer" claims here, we do not explore the application of Petro-Chem's constitutional analysis to this case.
 
 
 45
 In HWTC II, BVER Environmental, a member of HWTC, alleged that it was "in the business of receiving non-hazardous used oil from heavy manufacturing industries for processing and resale as boiler fuel," and that its "receiving facilities" were damaged when it received used oil that was contaminated. 861 F.2d at 281. In order to protect itself, BVER would have had to undertake "expensive" (and extensive) testing. Id. We held that its injury was sufficient to confer standing upon it, and through it, upon HWTC. Id. at 282.
 
 
 46
 Like defense contractors, treatment firms, and the disposal firms whose consumer claims are our subject here, BVER's ultimate interest was in money, of course. "That the injury is commercial is no obstacle," HWTC II, 861 F.2d at 282, however, for if it were, no person, business, or association whose ultimate interest was pecuniary would ever be within the zone of interests of a statute adopted for any purpose other than its direct financial benefit. This result would be at war both with the Supreme Court's and our own cases and with common sense. It is in the methods by which BVER and the disposal firms, respectively, earn their money that we see the relevant distinction.
 
 
 47
 BVER was a recycler of used oil. So far as appears, its only direct concern with the stringency of EPA's implementation of RCRA was that the regulation in suit provide a remedy for the injury it claimed to suffer from the receipt of oil contaminated by hazardous constituents. That injury was caused by precisely the environmental problem that the relevant statutory provision was designed to eradicate, and we have no basis upon which to think that the nature of BVER's business gave it an incentive to propose an interpretation of RCRA at odds with Congress's purpose.
 
 
 48
 Here, on the other hand, the immediate interest claimed by the disposal facilities is in avoiding liability, which may or may not coincide with the public interest in protecting human health and the environment. It may be in the public interest, for example, for disposal firms to be liable for the disposal of inadequately treated waste, but they would presumably support an interpretation of the statute that placed upon waste generators all liability for inadequate disposal. That their economic interest might, in this or another case, coincide with the congressional interest in safeguarding health and the environment, would be but happenstance; and short of resolving the merits, we have no way of determining whether this case presents that happy coincidence. Again, we are concerned with the challenger, not the challenge; here, the challenger's interest in reduced liability is "so marginally related to" the purpose of the statute, Clarke, 479 U.S. at 399, 107 S.Ct. at 757, that we must infer that Congress did not permit a suit at its behest.
 
 
 49
 Thus, while a business consumer of a contaminated substance (like BVER in HWTC II ) is an adequate proxy for the environmental interest of those whom the statute is designed to protect and is therefore a "suitable challenger" of agency action, a participant in the waste disposal process has interests that may be fundamentally inconsistent with the interests Congress had in mind when it enacted the statute. A waste disposal firm is therefore a peculiarly unsuitable proxy for those whom Congress intended to protect, and is therefore not within the zone of interests.
 
 III. CONCLUSION
 
 50
 Because none of HWTC's members would have prudential standing to pursue this action in its own right, HWTC does not have standing to sue on their behalf. Accordingly, the petitions for review are
 
 
 51
 Dismissed.
 
 WALD, Chief Judge, dissenting:
 
 52
 The Hazardous Waste Treatment Council ("HWTC" or "the Council") seeks in this action to challenge the Environmental Protection Agency's ("the EPA") "California List" rules. To satisfy our threshold inquiry into standing, the Council has alleged several varied and independent bases to support its right to pursue its claims. I agree with the majority that some of these allegations fail to establish standing. In its rush to dismiss HWTC's petition, however, the majority has seriously misanalyzed HWTC's primary standing contention, and in so doing has fundamentally misconstrued and misapplied our customary standing inquiry. For the reasons that follow, I respectfully dissent from the majority's conclusion that the Council lacks standing in this case.[1]
 
 I. PRUDENTIAL STANDING
 
 53
 A. The "Zone of Interests" and HWTC's Claims of Standing
 
 
 54
 The zone of interests test should be, as the majority contends, elegantly simple in its conception: it is a device that courts employ to ascertain whether Congress, having enacted a statute with broad provisions for standing to challenge agency action thereunder, nevertheless intended to foreclose a suit brought by certain parties who have suffered an "injury" under the statute. The notion underlying the zone of interests test is that even the broad standing envisioned by Sec. 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 702, should be read to impose some limits, so that courts do not entertain suits that seek to "vindicate" interests that Congress had no intention of protecting or regulating. This somewhat abstract objective is grounded in the more practical recognition that courts that decide cases at the behest of peripheral parties who have only the most attenuated (or even nonexistent) stake in the core statutory purposes run the risk of frustrating rather than furthering the balance Congress has struck between competing interests in a given statutory scheme. See Clarke v. Securities Industry Association, 479 U.S. 388, 397 n. 12, 107 S.Ct. 750, 756 n. 12, 93 L.Ed.2d 757 (1987). It behooves us to remember throughout, however, that "at bottom the reviewability question turns on congressional intent." Id. at 400, 107 S.Ct. at 758. In the present case, the majority has lost sight of this essential purpose, and has crafted instead a new obstacle to standing that is entirely of its own making. Before addressing the majority's discussion in this case in any detail, however, I will outline how the court should have gone about finding that standing requirements were satisfied by HWTC in the present case.
 
 
 55
 The "zone of interests" test for standing was first announced almost twenty years ago in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 829-30, 25 L.Ed.2d 184 (1970). There the Supreme Court explained that the question of standing under the Administrative Procedure Act goes beyond the constitutional requirement of a "case" or "controversy," insisting that "the interest sought to be protected by the complainant [be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. In the ensuing years, the doctrine has given rise to much controversy and confusion, both among courts and commentators.[2] Just two years ago, in Clarke, the Supreme Court itself reined in what had become an excessively rigorous application of a doctrine that, in its own words, was "not meant to be especially demanding." See 479 U.S. at 399, 107 S.Ct. at 757. The Court expressly stated in Clarke that the zone of interests test should be used to infer congressional intent to deny review only "if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." Id. (emphasis added).
 
 
 56
 By formulating the test so generally, the Supreme Court made it abundantly clear that a presumption should exist that parties who meet the constitutional requirements for standing should be allowed to sue unless it is shown that there is a special reason why their challenge should not be entertained--unless, that is, "would-be plaintiffs [are] not even 'arguably within the zone of interests to be protected or regulated by the statute....' " Id. at 397, 107 S.Ct. at 756 (quoting Data Processing, 397 U.S. at 153, 90 S.Ct. at 830) (emphasis added). The Court's admonition to this circuit in particular was that "there need be no indication of congressional purpose to benefit the would-be plaintiff." Id. 479 U.S. at 399-400 & n. 15, 107 S.Ct. at 757 n. 15 (finding that the contrary approach taken in Control Data Corp. v. Baldrige, 655 F.2d 283, 293-94 (D.C.Cir.1981), was "inconsistent with our understanding of the 'zone of interest' test, as now formulated."). That is, even where Congress does not evidence an express intent to benefit the interests of a certain group or allow a suit at its behest, the "zone of interests" bar cannot be invoked without a finding that it is not even arguable that Congress intended to benefit the members of the petitioner group.
 
 
 57
 As the majority notes, there are two types of claims under the zone of interests test. First, there are claims that a party is interested by virtue of being regulated by the relevant statutory scheme. In the typical case, such claimants complain of administrative over-regulation. I do not take issue with the majority's finding in this case, see Maj. op. at 922, that HWTC is not "regulated" for purposes of the zones of interests test when its masochistic-like complaint is that the agency has not constrained it sufficiently.
 
 
 58
 Second, and more important for this case, however, a party may claim that it has interests that Congress sought to protect through enactment of a regulatory scheme. Ordinarily, such claimants complain that administrative under-regulation leaves their interests unprotected in a manner that Congress "arguably" sought to ameliorate. As outlined above, this aspect of the test envisions a loosely defined "zone" into which all interests but those furthest from the collective mind of Congress will fall, and anyone whose interests plausibly do fall within this zone will be entitled to bring challenges alleging underprotection of these interests. And as our prior precedents make clear, such an approach recognizes that even in the absence of "apparent" congressional intent to benefit, the zone of interests test imposes no bar on standing so long as some factor "supports an inference that Congress would have intended eligibility." Hazardous Waste Treatment Council v. EPA, 861 F.2d 277, 283 (D.C.Cir.1988) ("HWTC II "), cert. denied, --- U.S. ----, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989). Thus, prior to today our cases followed the liberal spirit of the Supreme Court in this murky terrain.
 
 
 59
 Not so in the present case. Astonished by the majority's conclusion to the contrary, I find that HWTC has easily met the requirements of the zone of interests test and should have been granted standing to sue. Indeed, a proper understanding of the Council's allegations of standing in this case would, in my view, have obviated the bulk of the majority's misconceived and, I fear, quite wrong pronouncements about the current state of standing law. The majority's opinion operates on the premise that HWTC has advanced only one claim of standing on behalf of its members as "intended beneficiaries" under the Hazardous and Solid Waste Amendments of 1984 ("HSWA"), i.e., that Congress sought to bolster the competitive position of firms offering advanced treatment technologies when it enacted the amendments. See Maj. op. at 923-924. Whatever merit I might find in this particular claim as an original proposition,[3] the majority is correct that previous opinions of this court have decisively ruled it out of the "zone of interests" cognizable under HSWA. See Maj. op. at 923 (citing HWTC II, 861 F.2d at 282-85; and Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433, 434-36 (D.C.Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989)).
 
 
 60
 After disposing of this argument, however, the majority ignores HWTC's other claims pertaining to its members as "intended beneficiaries." Amazingly, the majority relegates to the end of its opinion, under a subpart that is unrelated to its discussion of whether HWTC represents members with interests that Congress sought to protect under the law, HWTC's principal claim for standing, the one that the Council put forward first and most vigorously--namely, that the EPA's alleged regulatory laxity injures the interests of owners and operators of hazardous waste land disposal facilities who are members of HWTC. These particular members' interests, HWTC pleads, persuasively I believe, do fall within the zone of interests sought to be protected. In particular, HWTC alleges that "the [EPA's] rule[,] [which] improperly permits land disposal at [its members'] facilities of ... wastes which are merely 'solidified,' but not treated to levels achievable by the 'Best Demonstrated Available Technology' ...[,] necessarily increases the likelihood and severity of potential migration of hazardous constitutents from land disposal facilities into the environment, despite full regulatory compliance and the exercise of best engineering practices by land disposal facility operations." Affidavit of Richard C. Fortuna ("Aff.") at p 7. HWTC goes on to flesh out the injury to landfill operators' "consumer environmental interests" by pointing to the myriad practical consequences, beyond destruction or contamination of their land and the surrounding environment, that it alleges the rules will bring in their wake: the likelihood of hazardous constituent migration from land disposal facilities "imposes increased risks of environmental liability for clean-up costs, damages and regulatory penalties upon HWTC members...." Aff. at p 7. Moreover, HWTC alleges that the EPA's decision to grant generators a "no testing" option "make it more difficult, time consuming and expensive to ensure that restricted California List wastes are not improperly land disposed." Aff. at p 11.
 
 
 61
 In my view, these allegations fall squarely within this circuit's controlling precedent and compel a conclusion that HWTC should be afforded standing in this case. The alleged injuries to the land surrounding disposal facilities--land that is owned by HWTC members--presents a per se injury of a sort that Congress was centrally concerned with: the literal undermining of the integrity of the environment itself. The very core of the "zone of interests" sought to be protected by HSWA is the assurance that hazardous waste management practices are conducted so as to "minimize the present and future threat to human health and the environment." 42 U.S.C. Sec. 6902(b). Moreover, congressional attention was directly focused on the potential dangers of underregulated land disposal of liquid wastes. See H.R.Rep. No. 198, 98th Cong., 1st Sess. 31 (1983), U.S.Code Cong. & Admin.News 1983, 5589 ("[L]iquid hazardous wastes react with other wastes in the landfills and, because of enhanced mobility, present a substantial threat to groundwater resources located beneath the landfill once the liner has been breached."); S.Rep. No. 284, 98th Cong., 1st Sess. 6 (1983) ("Taken as a whole, the reported bill emphasizes [that] ... waste that is ... generated should be treated, stored, or disposed of so as to minimize the present and future threat to human health and the environment."). The HSWA's twin objectives--promotion of human health and preservation of environmental integrity--call to mind immediately two directly interested groups who are the best positioned to vindicate Congress' purposes: the goal of human health can be pursued by persons who are themselves put at risk, while the integrity of the natural environment that is threatened by under-regulation can be championed by those who own land that is at risk of infection by dangerous hazardous waste. HWTC represents landfill operators, who seek to assure that the wastes that they receive from others and that they then put into the ground will not infect their own land, the lands of their neighbors, groundwater, etc. That their immediate motivation for bringing this suit is economic is, as the majority concedes, of no moment.
 
 
 62
 These environmental consumer interests are markedly distinct from the noncognizable "competitor interests" by reference both to where the injuries originate and how they are linked to Congress' concerns in enacting the statute.[4] HWTC's competitor injuries do not flow from the environmental harms themselves, but rather only from the alleged failure of the EPA to regulate sufficiently. They are not causally linked to the primary focus of Congress, environmental degradation. By contrast, the economic injuries asserted on behalf of the owners of land disposal sites arise as a result of, not merely as concomitants to, environmental degradation. It is thus entirely appropriate to find that these latter interests are within the zone created by Congress' regulatory scheme.
 
 B. The Majority's Analysis
 
 63
 Had the majority properly analyzed the Council's allegations of standing in the straightforward manner outlined above, it could have satisfied itself at the threshold that HWTC did indeed represent members who were "arguably" intended to be the "direct" beneficiaries of HSWA. That would have been the end of the standing inquiry, and we could have proceeded to the merits of this case. But the majority's focus was apparently trained on its effort to rewrite "zone of interests" law, and in the process it lost sight of the Council's most relevant allegations in this case. Because, however, its rewriting of "zone of interests" law is in my view so fundamentally at odds with Supreme Court and current precedent, I address its most serious errors.
 
 
 64
 At base, the majority's opinion can best be read as an attempt to reinvigorate the stringent zone of interests requirements that the Supreme Court has condemned. Notably, the majority appears determined to reimpose the requirement that Congress "expressly or directly indicate[ ]" when it intends to benefit a party's interests before that party will be granted standing. Maj. op. at 922. This is how the majority casually (and without any acknowledgement that the Supreme Court has flatly rejected such a standard) states the test for its first inquiry under the zone of interests test--as if only those whom Congress "expressly or directly" indicates a desire to benefit can be seen as "arguably" intended beneficiaries. The unvarnished truth is that no such standard has ever been announced or hinted at since Clarke, and our post-Clarke circuit cases prior to today have allowed standing under the zone of interests test for parties who were arguably intended beneficiaries without any "express or direct" indication by Congress of an intent to benefit. See, e.g., Humane Society of the United States v. Hodel, 840 F.2d 45, 61 (D.C.Cir.1988) (plaintiffs' interests were "hardly at odds with the substantive prescriptions " of the relevant Acts (emphasis added)).
 
 
 65
 True, the majority appears to leave open a second, superficially more relaxed possibility of standing for so-called "suitable challengers"--"parties whose interests, while not in any specific or obvious sense among those Congress intended to protect, coincide with the protected interests." Maj. op. at 922-923 (emphasis added). In prior cases, this suitable challenger analysis, however, was employed only where it was clear that a party was not even plausibly within the zone of protected interests, but where "some factor--some indicator that the plaintiff is a peculiarly suitable challenger of administrative neglect," HWTC II, 861 F.2d at 283, would support an inference that Congress would not have objected to standing. Thus, in National Cottonseed Products Ass'n v. Brock, 825 F.2d 482, 489-92 (D.C.Cir.1987), cert. denied sub nom. National Cottonseed Products Ass'n v. McLaughlin, --- U.S. ----, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988), we held that 3M had standing to challenge filter requirements on respirators it produced, not because 3M was an even arguably intended beneficiary, but because 3M's customers were within the zone of interests--the vendor-vendee relationship was the special factor that made the company a "suitable challenger." But in today's decision, this minor safety valve category--the suitable challenger inquiry--has been elevated to become a principal test for all those parties that Congress did not expressly or directly indicate a desire to benefit. The Supreme Court's "arguably protected" test has been abandoned in the process. And the new "suitable challenger" test that supercedes it is indeed an "especially demanding" one.[5] It requires considerably more imagination than I have been able to muster to determine what sorts of interests, as a practical matter, could ever satisfy this second part of the test as it has now been formulated. The majority in this case, for instance, has demonstrated a remarkable willingness to fathom points of divergence between the interests of the members of HWTC and the so-called "intended beneficiaries." The majority notes that "the immediate interest claimed by the disposal facilities is in avoiding liability," and that may or may not coincide with the "public interest in protecting human health and the environment." Maj. op. at 16. Although the only challenges that HWTC raises in this dispute seek more strict environmental regulation--and this is plain from the surface of its claims--the majority fears that parties such as HWTC might, for example, lead us unwittingly to shift liability to waste generators, even though the case before us presents no such issue of apportioning liability. This sort of fanciful inquiry into how the challenger might seduce a naive court into taking actions totally outside the ambit of the case before it leaves me with a haunting sense that this "suitable challenger" inquiry--the insistence that parties who are not express recipients of congressional solicitude show that their interests "systematically coincide" with the interests of those who are express beneficiaries--will degenerate in the vast majority of cases into only a phantom category, a pleasing verbal formulation destined to ring hollow in providing any real supplement to the "express" requirement.
 
 
 66
 The majority, however, asserts that "[t]he Supreme Court has identified" these two inquiries--namely, (1) an express congressional declaration of an intent to benefit, or (2) interests that "coincide" with such expressly protected interests. Maj. op. at 922. Yet one searches in vain for any Supreme Court precedent to support the majority's approach. The majority has at the same time tightened the requirements for "intended beneficiaries" and put the squeeze on "suitable challengers," and many litigants that would satisfy the "arguably protected" zone of interests test as conceived by the Supreme Court--such as HWTC in this case--will inevitably fall into the gap that the majority's approach has created. Make no mistake: the majority's articulation spells no access to review for sizeable numbers of plaintiffs who meet Article III constitutional tests for standing.
 
 
 67
 C. The Majority's "Challenger/Challenge" Dichotomy
 
 
 68
 As the majority spins out of its "new and improved" zone of interests test, it surfaces several other unfortunate conflicts with existing precedent. Perhaps most notable is its perplexing discussion of whether for purposes of standing we should focus on the challenger or on the challenge in the litigation--as though it is possible to meaningfully separate the two. The Supreme Court, the majority explains, "has yet to rule on the question." Maj. op. at 925. The majority, however, has no such reluctance: "we have no doubt that it is the interests that the challenger seeks to protect and not the challenge with which we must be concerned." Id. The problem, of course, is in the irrelevancy of the question itself; it attempts to force a contrived dichotomy between a claimant and his claim. It is obvious from prior standing law that a standing inquiry cannot focus exclusively on whether a particular challenger may sue in the abstract. Rather, standing doctrine requires us to inquire in each case whether this challenger may bring this challenge. It is not possible to determine either prong of this inquiry without reference to the other.
 
 
 69
 The majority is evidently unaware of our prior cases addressing the zone of interests test that have discussed precisely this point. In 1977, we stated our awareness of "the confusion surrounding the meaning of which interests are relevant to the zone test":
 
 
 70
 Essentially, the confusion surrounds what exactly has to fall within the relevant zone: 1) the parties themselves; 2) the interests of the parties in general; or 3) the particular interest the parties are asserting in the litigation. It seems clear to us that the particular interests are the relevant interests in the context of an application of the zone standard.
 
 
 71
 Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 142 n. 76 (D.C.Cir.1977) (citation omitted), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). By 1987, this court stated that it had become "the settled law of this circuit that 'the "zone" test is supposed to focus on "the interest asserted by a party in the particular instance." ' " Haitian Refugee Center v. Gracey, 809 F.2d 794, 812 (D.C.Cir.1987) (quoting American Friends Service Comm. v. Webster, 720 F.2d 29, 52 (D.C.Cir.1983)) (emphasis added). Adherence to this traditional approach, however, would require a different result from the majority's, i.e., HWTC is a suitable challenger in this case, whereas under its novel approach the majority lavishes attention, not on the alleged interests of HWTC in this case, but rather on HWTC's "meta-standing"--i.e., whether HWTC, considered as a whole, should be allowed to challenge the EPA's alleged under-enforcement of the Hazardous and Solid Waste Amendments of 1984. In effect, the majority would like to look beyond "the interest asserted by [HWTC] in the particular instance," preferring instead to conduct a more searching and comprehensive inquiry into HWTC's representation of varied interests in the waste disposal industry and its underlying "real" motivations in bringing this suit.
 
 
 72
 This approach, which in effect changes a touch-down "zone of interests" inquiry into an intensive probe and litmus test as to the purity of the plaintiff's motives and the potentiality of conflicting postures toward regulation because of the differing postures of its members, is very clearly not the law. The most direct refutation of the majority's approach comes from our recent decision in HWTC II, in which no such search was made through HWTC members' manifold (and even conflicting) interests to determine whether it had standing to make five challenges to the EPA's rules regulating the burning of hazardous waste and used oil as fuel, promulgated pursuant to the statutory scheme introduced in the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Secs. 6921-6939a. The court in that case followed the traditional and proper path: it rejected HWTC's claim to standing on the basis of its members' so-called "competitor claims," but went on to analyze the distinct interests of one lone member of HWTC, BVER Environmental, on whose behalf HWTC alleged injury to "consumer environmental interests." Concluding that BVER's interests did fall within the protected zone (in precisely the same way that land disposal operators fall within the same zone, see supra ), the court went on to apply the Supreme Court's test for representational standing outlined in Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), in particular asking whether "the interests [the association] seeks to protect are germane to the organization's purpose." Id. at 343, 97 S.Ct. at 2441. Because HWTC's charter states that the Council aims, inter alia, to "promote the protection of the environment through the adoption of environmentally sound practices and methods of destroying and treating hazardous wastes," the court found the standard met. Most important, the court made no effort to divine HWTC's "overall" interests to determine whether HWTC was a "suitable challenger" in the abstract. Indeed, had it done so it might very well have found that HWTC's members' "competitor interests" were predominant and would, according to the expansive new reading given the standing inquiry by the majority today, not "coincide" with what the HWTC II court found to be directly protected interests. In fact, the HWTC II court squarely confronted the problem that "HWTC's primary interests have a quite different focus from BVER's interest in consuming relatively clean used oil," 861 F.2d at 286 (emphasis in original), but expressly concluded that "the potential split appears no bar," id. (emphasis added). I can find no meaningful distinction between that case and ours; the majority has in my view totally revamped the landscape of "zone of interests" law to the end of frustrating access to complainants with real injuries.
 
 
 73
 Traditional standing inquiry simply does not call upon us to make the sort of global pronouncements about a party's overall fitness to sue in the abstract the majority engages in today. Indeed, the majority's abiding concern about difficulties that we would encounter in determining whether a particular challenge will further the goal of a statute positively pales in comparison to its approach charging courts with the making of profound judgments about the overall suitability of diverse organizations or sprawling multinational corporations to challenge regulatory schemes, insisting we weigh the various ways in which the entity's interests are internally inconsistent or conflict with other groups who would be within the zone of interests. This is not an appropriate task for the courts. Rather, our proper focus--like that of the HWTC II court--should be on whether the party seeking standing is able to satisfy the simple and relatively straight-forward threshold tests summed up in the Supreme Court's "arguably protected" phrase which we have heretofore applied.
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 Because the majority approaches HWTC's principal standing allegation as something other than what it is--namely, an allegation of injury to interests that stand at the heart of the zone protected by HSWA--it makes the mistake of subjecting HWTC to a standard that it is destined to fail. Rather than finding that landfill operators would have standing to sue, and proceeding to determine whether HWTC should be allowed to bring the suit as their representative,[6] the majority undertake to determine whether HWTC is a "suitable challenger," an inquiry that is designed to determine if one party can fairly be relied upon to serve as a proxy for others. In effect, the majority attempts to keep HWTC out because it does not fit through the narrow window the majority has described for "suitable challengers"--but HWTC seeks entrance by way of the front door, as guests that Congress has invited as "intended beneficiaries." That Congress never expressly stated its desire to protect the interests of land disposal facilities by name (just as it failed to specify explicitly its intent to benefit BVER Environmental, the processor and reseller of used oil that was found to be within the zone of interests in HWTC II ) is beside the point, for Congress did expressly state its desire to protect the land and landwater from destruction, and HWTC is entitled to present the claims of entities who own such land that is said to be put at risk from the EPA's alleged under-regulation. It cannot tenably be argued that these interests are "so marginally related to or inconsistent with the purposes implicit in the statute" that Congress would have intended to forbid this suit.
 
 II. CONSTITUTIONAL STANDING
 
 77
 Because the majority disposes of this case on zone of interests grounds, it has deemed it unnecessary to discuss whether the injuries alleged, quite apart from whether they implicate interests that Congress was arguably concerned with, even satisfy the constitutional requirements of "case" or "controversy." See Maj. op. at 4926. To those who understand the traditional standing inquiry to be a two-step process--first, constitutional injury, and then second, prudential concerns[7]--the majority's decision to leap over the discussion of the constitutional aspects of standing--to ignore it altogether--may seem odd. It is. Indeed, much of the misconceived reasoning in the majority's opinion might most charitably be understood as an effort to evade the issue of constitutional standing at all costs. Because I cannot see the zone of interests test as a bar to standing in this case, I must confront the issue of constitutional standing, and the degree to which this court should stretch our opinion in Petro-Chem to cover cases of this nature. I believe that on the separate issue of constitutional standing, HWTC also satisfies our requirements.
 
 
 78
 As a general matter, "[f]or constitutional standing, a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." HWTC II, 861 F.2d at 281-82 (citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758-59, 70 L.Ed.2d 700 (1982)). In this case, it seems clear to me that HWTC has met this test. For purposes of standing, we assume that the plaintiff is correct on the merits of her claim, and we therefore must assume that HWTC is correct that the HSWA requires more stringent regulation of California List wastes. HWTC seems amply entitled to raise its challenges, for it has convincingly shown the possibility that it will suffer tangible injuries flowing from the under-regulation it alleges. As a general matter, that should suffice to end the inquiry.
 
 
 79
 There remains the hurdle, however, of this court's somewhat puzzling statements in Petro-Chem, 866 F.2d at 438. There, the court faced claims by HWTC that had great surface similarity to the claims advanced by the Council in this case. In Petro-Chem, HWTC claimed that lax EPA regulations, which allowed disposal of hazardous waste in geologic repositories, injured HWTC members by exposing those members who use such repositories to "strict, joint, and several liability under the Comprehensive Environmental Response, Compensation, and Liability Act," 42 U.S.C. Secs. 9601-9657, when these unsafe repositories leaked. The court rejected HWTC's claim that such an injury gave its members--and thus the Council in its representational capacity--standing to sue because, the court concluded, the potential liability was "incurred voluntarily," and therefore was "not an injury that ' "fairly can be traced to the challenged action." ' " 866 F.2d at 438.
 
 
 80
 Rather, to the extent that this injury is self-inflicted, it is "so completely due to the [complainant's] own fault as to break the causal chain " [quoting 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d Sec. 3531.5, at 458 (2d ed. 1984) ("Wright & Miller") ]. Unlike the "consumer" firm in HWTC II, ... members choosing geologic repositories can avoid the threatened injury by choosing safer methods. If they instead choose disposal methods they believe to be unsafe, they presumably so do in their own self-interest. It is of no moment for the inquiry at hand that they may be "forced" by competitive pressures to choose unsafe methods; we cannot deem them injured, in the sense relevant under controlling precedent, by their own choice to compete in kind.
 
 
 81
 Id. (emphasis added).
 
 
 82
 A fair reading of this somewhat terse passage, and the materials cited therein, commands that special attention be called to the italicized portion of this section of the court's opinion. It is a quotation from Wright & Miller, from a section that deals more generally with causation and the issue whether injuries that "seem[ ] solely attributable to the plaintiff," Wright & Miller Sec. 3531.5, at 457 (emphasis added), can support standing. The discussion begins with a commonsense recognition that "[s]elf-inflicted injury may seem a suspicious basis for standing," id. at 456, but continues that "no rigid lines are drawn on this basis," id. Wright & Miller explains the rule that can be discerned as follows:
 
 
 83
 Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury. Standing is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain.
 
 
 84
 Id. at 458. I infer from this excerpt that the notion that voluntary choice can break the causal chain for standing purposes should be read quite narrowly--for surely all judicially cognizable injuries can be traced back to some voluntary action of the plaintiff, even if it is nothing more than the decision to get out of bed in the morning and expose oneself to the risks of modern life. No one would argue that an accident victim's injuries were self-inflicted simply because he "voluntarily" chose to drive onto a highway. Rather, we search for the presence of the fault of another, and so long as the accident was not "so completely due to the plaintiff's own fault," we grant standing.
 
 
 85
 The injury alleged in Petro-Chem--liability stemming from the decision to place hazardous waste in salt domes and other geologic repositories--apparently struck the court as nothing more than a wholly voluntary decision (or perhaps more properly, incipient threat) on the part of waste disposal operators to harm the environment and expose themselves to liability, quite possibly for the sole purpose of creating standing in that case. The court disregarded half of the Council's argument--that economic pressures would force this decision, by dooming those who failed to accede to such pressures to the alternative of competitive ruin--and focused on the fact that all the immediate factors going into the decision were apparently under the exclusive control of the disposal operators. That is, with full knowledge of what they were doing, they would put hazardous waste in repositories that they knew would not contain the waste's hazardous constituents. The HWTC members in Petro-Chem were essentially seeking stricter regulation of themselves in order to avert environmental catastrophe, and the court's response was to refuse to give judicial sanction to such thinly veiled threats when the intervention of the government was not necessary to ameliorate this self-inflicted harm.
 
 
 86
 The Council's claim of injury in the present case--like that recognized in HWTC II--is altogether different for the simple reason that the plaintiffs here do not allege that lax EPA regulation of themselves will somehow cause them to knowingly put dangerous waste into the ground and thereby incur liability. Rather, they complain that the EPA's lax regulation of others--notably, waste generators--will cause these third parties to deliver into the hands of land disposal operators hazardous waste that is certified as safe for land disposal but which, because of their unknown properties, in fact could expose them to severe liability and sanctions in the future. Moreover, this is not the only element of HWTC's allegations: precisely as BVER Environmental alleged in HWTC II, the Council here argues that in order to responsibly avoid the injuries that could stem from EPA's lax regulations, members will face equally injurious financial drains, because the EPA's policies "make[ ] it more difficult, time consuming and expensive to ensure that restricted California List wastes are not improperly land disposed." Aff. at p 11. Compare HWTC II, 861 F.2d at 281-82 (crediting HWTC's identical argument that one member company, which was in the business of receiving used oil from heavy manufacturing industries for processing and resale, found it "expensive to test every tankload" when lax EPA regulations caused third parties to ship it adulterated or contaminated used oils, and therefore "suffer[ed] direct loses as a recipient of contaminated used oils"). These injuries suffice, in my view, to satisfy the constitutional requirements for standing.
 
 III. CONCLUSION
 
 87
 There is an undercurrent of unease in the majority's opinion with the fact that HWTC is not the ideal challenger of these regulations. This ideal is satisfied in cases where traditional environmental groups are able to commit their resources to challenging agency actions. But of course the mere existence of these more conventional challengers, even if they might seem more comfortable, does not in any way operate to cancel the otherwise valid standing of parties like the land disposal operators in this case, or groups like HWTC who seek to sue on their behalf. Cf. Public Citizen v. Department of Justice, --- U.S. ----, 109 S.Ct. 2558, 2564, 105 L.Ed.2d 377 (1989) ("The fact that other citizens or groups might make the same complaint ... does not lessen appellants' asserted injury."). The recognition that these other more conventional champions of environmental interests unquestionably fall within the zone of interests does not mean that there is no room left for other groups to "arguably" fit within the zone. Data Processing, 397 U.S. at 153, 90 S.Ct. at 829-30 (quoted in Clarke, 479 U.S. at 397, 107 S.Ct. at 756). In this case, however, the majority has seen fit to erect stiff barriers unjustified by the Supreme Court or our own prior precedent to keep the nontraditional challengers out of court. Because I believe that this approach is both ill-advised and inconsistent with the zone of interests test as it has been articulated by the Supreme Court, I respectfully dissent.
 
 
 
 [1]
 The "California List" comprises liquid wastes containing defined concentrations of free cyanides, certain metals, PCBs, or halogenated organic compounds, and acidic liquid wastes. 42 U.S.C. Sec. 6924(d)(2). HSWA designates these wastes "California List" based upon an earlier statute in that state limiting their land disposal
 
 
 [2]
 The dissent suggests that our analysis of standing must proceed from constitutional to prudential requirements. Dissent at 16 (citing cases). Although that is the oft-stated sequence, the rule of avoidance counsels nonetheless that, where the prudential question is clearly dispositive, we should not reach out to determine the constitutional issue. See Water Transport Ass'n v. ICC, 819 F.2d 1189, 1194 (D.C.Cir.1987); Calumet Industries, Inc. v. Brock, 807 F.2d 225, 228 (D.C.Cir.1986); Public Citizen v. Lockheed Aircraft Corp., 565 F.2d 708, 714 (D.C.Cir.1977)
 
 
 [3]
 The dissent contends that petitioners thus are intended beneficiaries of RCRA. Dissent at 5-6. Although Congress plainly sought to guard against damage to the environment, that is not the injury that petitioners assert here; rather, their alleged injury is derivative. They do not claim harm to the environment per se but, instead, foresee for themselves an "increased risk of ... liability"--to either the Government or neighboring land owners--for such harm. Neither petitioners nor the dissent offer evidence, however, that Congress, through enactment of RCRA, intended to protect operators of disposal facilities from such liability
 
 
 [1]
 My dissent addresses only the issue of standing. I do not find it necessary in this case to discuss the merits of the Council's claims, and this opinion should therefore not be read to intimate any views thereon
 
 
 [2]
 The Supreme Court itself has recognized that "[t]he 'zone of interest' formula ... has not proved self-explanatory," Clarke, 479 U.S. at 396, 107 S.Ct. at 755-56, citing several examples of scholarly criticism. See id. n. 11
 
 
 [3]
 In particular, Congress evidenced a desire "to encourage the development of alternative treatment technology and capacity, by drastically reducing current dependence on land disposal." H.R.Rep. No. 198, 98th Cong., 1st Sess. 32, reprinted in 1984 U.S.Code Cong. & Admin.News 5576, 5591
 
 
 [4]
 This inquiry--focusing on whether the asserted interests are traceable to the core injury that the statute seeks to attack--originated with the Supreme Court. In Data Processing, the Court "concluded that Congress had arguably legislated against the competition that the petitioners sought to challenge, and from which flowed their injury." Investment Company Institute v. Camp, 401 U.S. 617, 620-21, 91 S.Ct. 1091, 1094, 28 L.Ed.2d 367 (1971) (quoted at length and with approval in Clarke, 479 U.S. at 397 n. 13, 107 S.Ct. at 756-57 n. 13) (emphasis added)
 
 
 [5]
 The majority attempts to explain its analysis of BVER Environmental's claim in HWTC II as consistent with its result in this case today, but its analysis is a non sequitur. In HWTC II, it is very clear that the court did not deal with BVER's claims under the rubric "suitable challenger"; rather, the court found that BVER's "consumer environmental interests" fell within the zone of interests protected by the statute. It is extremely misleading to transform HWTC II 's analysis in this way
 
 
 [6]
 In this regard, the discussion of the HWTC II court should be controlling. See 861 F.2d at 286
 
 
 [7]
 Compare Data Processing, 397 U.S. at 152, 90 S.Ct. at 829 ("The first question is whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise."); Barlow v. Collins, 397 U.S. 159, 167-68, 90 S.Ct. 832, 838-39, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting) (describing the Court's approach to standing set out in Data Processing as having "two steps: (1) ... to determine 'whether the plaintiff alleges that the challenged action has caused him injury in fact'; (2) if injury in fact is alleged, the relevant statute or constitutional provision is then examined to determine 'whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected....' "). See also Investment Company Institute v. FDIC, 815 F.2d 1540, 1544 (D.C.Cir.), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987) ("Once we find ['injury in fact'], we must turn to the 'prudential' or 'zone of interests' standing test....")