**LIQUID CARBONIC INDUSTRIES CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Polk Power Partners, Limited Partnership, Lavair Cogeneration Limited Partnership, Intervenors.**

**LIQUID CARBONIC INDUSTRIES CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Lavair Cogeneration Limited Partnership, Intervenor.**

**LIQUID CARBONIC INDUSTRIES CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Lavair Cogeneration Limited Partnership, AES WR Limited Partnership, Intervenors.**

**Nos. 93–1095 to 93–1097.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1993.

Decided July 22, 1994.

Kevin J. McIntyre, Washington, DC, argued the cause for petitioner Liquid Carbonic Industries Corporation. On brief were Floyd L. Norton, IV, and Bruce L. Richardson, Washington, DC.

Robert H. Solomon, Deputy Asst. Gen. Counsel, F.E.R.C., Washington, DC, argued the cause for respondent Federal Energy Regulatory Commission. On brief were Jerome M. Feit, Solicitor, and Thomas J. Lane, F.E.R.C., Washington, DC.

Robert F. Shapiro, Washington, DC, argued the cause for intervenors AES WR Ltd. Partnership and Polk Power Partners, Ltd. Partnership. On brief were Adam Wenner, Lynn N. Hargis and Richard C. Tufaro, Washington, DC.

Matthew W.S. Estes, Washington, DC, and Steven F. Greenwald, San Francisco, CA, entered appearances for intervenor Lavair Cogeneration Ltd. Partnership.

Before: SENTELLE and HENDERSON, Circuit Judges; LEVIN H. CAMPBELL, Senior Circuit Judge.*

Opinion for the court filed by Circuit Judge HENDERSON.

---

* Of the United States Court of Appeals for the First Circuit, sitting by designation pursuant to 28 U.S.C. § 294.

KAREN LeCRAFT HENDERSON, Circuit Judge:

In this consolidated proceeding, Petitioner Liquid Carbonic Industries Corporation (Liquid Carbonic), a Delaware corporation in the business of producing and selling industrial gases, seeks review of three orders issued by the Federal Energy Regulatory Commission (FERC). In each order, FERC certified a proposed cogeneration facility[1] as a "qualifying cogeneration facility" within the meaning of section 201(8) of the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 (PURPA). 16 U.S.C. § 796(18). FERC rejected Liquid Carbonic's arguments that the proposed facilities did not meet PURPA's "qualifying cogeneration facility" standards and denied Liquid Carbonic's request for rehearing. On three petitions for review, Liquid Carbonic asserts that FERC's orders violate PURPA standards and conflict with FERC precedent and that FERC's refusal to hold hearings on the orders was arbitrary and capricious. We do not reach the merits of Liquid Carbonic's petitions, however, because it lacks standing before this court.

## I.

Congress enacted PURPA in the wake of the energy crisis of the early 1970s to lessen dependence on foreign oil, reduce the risk of natural gas shortages and control consumer costs. *See FERC v. Mississippi*, 456 U.S. 742, 746, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532 (1982). Toward those ends, section 210 of PURPA encourages the development of cogeneration facilities. 16 U.S.C. § 824a–3(a). Cogeneration is the sequential use of energy to produce electricity and either steam or some other useful thermal energy. *Ameri-*

can Elec. Power Serv. Corp. v. FERC, 675 F.2d 1226, 1229 (D.C.Cir.1982), *rev'd on other grounds*, 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). The rationale behind encouraging cogeneration is that the production of electricity frequently results in the production of thermal energy as a byproduct; by using small amounts of additional fuel, cogenerators can produce large amounts of thermal energy. As we earlier observed, "[b]ecause both heat and electricity are created in a single process, about half as much fuel is used to produce electricity and heat as would be needed to produce the two separately." *American Elec.*, 675 F.2d at 1230. The additional thermal energy can be used instead of discarded as waste. PURPA encourages cogeneration by exempting cogeneration facilities certified by FERC as "qualifying cogeneration facilities" (QFs) from certain state and federal regulations, *see* 16 U.S.C. § 824a–3(a), and by requiring electric utilities to purchase electricity from, and sell backup power to, QFs at statutorily specified prices. *Id.* §§ 824a–3(a)–(c). Thus, QFs are ensured a market for their electricity production.[2]

PURPA establishes guidelines for the certification of facilities as QFs. First, PURPA defines a cogeneration facility as one that produces "(i) electric energy, and (ii) steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating, or cooling purposes." 16 U.S.C. § 796(18)(A). It then provides that a "qualifying cogeneration facility" means a cogeneration facility that "the Commission determines, by rule, meets such requirements (including requirements respecting minimum size, fuel use, and fuel efficiency) as the Commission may, by rule, prescribe." *Id.* § 796(18)(B)(i). In 1980, FERC adopted

---

1. Each of the facilities, Lavair Cogeneration Limited Partnership, AES WR Limited Partnership and Polk Power Partners, Limited Partnership, intervened in this proceeding.

2. FERC found that certain historical conditions tended to discourage cogeneration:

 Prior to the enactment of PURPA, a cogenerator or small power producer seeking to establish interconnected operation with a utility faced three major obstacles. First, a utility was not generally willing to purchase the electric output or was not willing to pay an appro-

priate rate. Secondly, some utilities charged discriminatorily high rates for back-up service to cogenerators or small power producers. Thirdly, a cogenerator or small power producer which provided electricity to a utility's grid ran the risk of being considered an electric utility and thus being subjected to extensive State and Federal regulation.

*Small Power Production and Cogeneration Facilities—Qualifying Status*, FERC Statutes and Regulations, Regulations Preambles (1977–81) ¶ 30,134, at ¶ 30,932 (C.C.H.1980).

rules prescribing the standards for QFs. Such facilities must "produce electric energy and forms of *useful* thermal energy (such as heat or steam), used for industrial, commercial, heating or cooling purposes through the sequential use of energy." 18 C.F.R. § 292.-202(c) (emphasis added).

FERC deems "useful" those applications of thermal energy that are common in industrial or manufacturing processes. *Electrodyne Research Corp.,* 32 F.E.R.C. ¶ 61,102 (1985). Therefore, when a facility's proposed thermal energy use is common in industry, FERC certifies the facility as a QF. The facility may use the thermal energy itself or export the energy to a non-affiliated entity; so long as the thermal energy use is common, the facility qualifies as a QF. When the use of the facility's thermal energy output is a new one or not common, FERC analyzes the application differently. *Id.* ¶ 61,278. First, FERC considers whether the thermal energy user—the "thermal host"—is, on the one hand, the cogenerator itself or its affiliate or, on the other hand, an independent entity. When an independent entity uses the energy, FERC considers the new application useful because it assumes that no entity would buy and use the thermal energy unless it served a legitimate purpose. If the thermal host at some point ceases purchasing the energy, the facility is no longer in compliance with FERC's rules and loses its QF certification. *Id.*

When the ultimate user of the thermal output is the cogenerator itself, or its affiliate, and the use is a new or uncommon one, FERC requires the cogenerator to demonstrate that the use involves "an independent business purpose with some economic justification." *York Canyon Generation Assocs.,* 44 F.E.R.C. ¶¶ 61,101, 61,287 (1988). FERC requires an independent business purpose because otherwise a cogenerator could use its thermal energy for an impractical purpose and claim qualifying status simply because it is "using" the thermal energy. To allow such a result, FERC maintains, would contradict Congress's intent to promote energy efficiency.

Liquid Carbonic challenges FERC's certifications of three facilities as QFs. On June 12, 1992 FERC certified Lavair Cogeneration Limited Partnership (Lavair) as a QF. Lavair proposed to generate electricity by burning natural gas and to export the steam generated during the process to an adjacent, unaffiliated CO2 manufacturing plant to use as energy in producing liquid CO2. In addition to the steam, Lavair also proposed to export exhaust gas, called "flue gas," which is rich in CO2; the thermal host would use the flue gas as raw feed gas for purification and conversion into liquid CO2. FERC classified the production of liquid CO2 using steam and flue gas, the "flue method," as common because it has certified many cogenerating facilities whose thermal hosts are CO2 production facilities. Because the production of CO2 is common, FERC certified Lavair. *Lavair Cogeneration Ltd. Partnership,* 59 F.E.R.C. ¶ 62,266 (1992). On July 13, 1992 Liquid Carbonic challenged the certification by requesting a rehearing, which FERC denied on December 3, 1992. *See* Joint Appendix (JA) 124–30.

AES WR Limited Partnership (AES WR) filed an application for QF status on April 13, 1992. AES WR proposed burning coal to produce electricity and using the thermal energy output to produce liquid CO2 in its own production facility. Because liquid CO2 production is common, FERC certified AES WR as a QF on July 10, 1992. JA 235–38. On August 11, 1992, Liquid Carbonic challenged the certification by petitioning for rehearing, which FERC denied on December 3, 1992. *See* JA 124–30.

On April 28, 1992 Polk Power Partners, Limited Partnership (Polk) filed an application for QF certification. Polk proposed burning natural gas to produce electricity and exporting the steam recovered during the process to an affiliated thermal host to produce liquid CO2 by the flue method. Liquid Carbonic moved to intervene on August 3, 1992, protested Polk's application and requested a hearing. FERC issued an order on October 6, 1992, concluding that Polk's application met the criteria for QF status and denying Liquid Carbonic's request for a hearing. JA 104–10. Liquid Carbonic then requested a rehearing, which FERC denied on December 3, 1992. *See* JA 124–30.

Liquid Carbonic asserts several grounds for reversing FERC's orders certifying Lavair, AES WR and Polk. Liquid Carbonic argues that the flue method of $CO_2$ production is economically infeasible or that, if it is feasible, it is so only because a QF will make a large enough profit from selling electricity—which electric utilities are statutorily required to purchase at set rates—that it can subsidize $CO_2$ production. Accordingly, Liquid Carbonic contends that the flue method of $CO_2$ production is not useful within the meaning of PURPA. It further argues that the three orders conflict with FERC precedent. Finally, Liquid Carbonic asserts that FERC's refusal to hold a hearing on the economic feasibility of the flue method is arbitrary and capricious in the light of evidence it proffered to establish the method's inefficiency. Liquid Carbonic asserts that we have jurisdiction to review its petition under section 313 of the Federal Power Act.[3]

## II.

While none of the parties raised the issue, we must satisfy ourselves that Liquid Carbonic has standing to petition for review. It is evident that Liquid Carbonic meets the Article III standing requirements of actual or threatened injury fairly traceable to the defendant's conduct and likely to be redressed. *See Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). FERC's QF certifications of Lavair, AES WR and Polk will increase competition with Liquid Carbonic by causing three new liquid $CO_2$ manufacturers to enter the market. Increased competition represents a cognizable Article III injury. *E.g., Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970) (loss of profit and customers satisfies Article III injury requirement); *First Nat'l Bank &*

*Trust Co. v. National Credit Union,* 988 F.2d 1272, 1275 (D.C.Cir.) (Article III injury requirement not in question when appellant suffers competitive injury), *cert. denied,* —— U.S. ——, 114 S.Ct. 288, 126 L.Ed.2d 238 (1993). Additionally, the competitive injury is traceable to FERC's QF certifications because, according to Liquid Carbonic, they will enable the cogenerators to subsidize the otherwise inefficient production of $CO_2$. Without certification, Liquid Carbonic alleges, neither the thermal hosts of Lavair and Polk, nor AES WR through its own $CO_2$ production facilities, would compete in the $CO_2$ market. Finally, a decision favorable to Liquid Carbonic would redress the competitive injury because decertification of the three applicants would effectively prohibit them from subsidizing the production of liquid $CO_2$. In Article III terms, therefore, Liquid Carbonic has standing.

■ The Article III analysis is not the only standing inquiry, however; in addition, we generally must satisfy ourselves that the petitioner meets prudential standing requirements. But this is not always the case. Congress may enact a statute that eliminates the prudential inquiry, thereby making review available to any party that establishes Article III injury, causation and redressibility. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In such a case, constitutional standing analysis is the only one in which we need engage. Accordingly, we must first determine whether Congress maintained or eliminated the prudential standing barrier when it authorized judicial review under PURPA.

In *Center for Auto Safety v. National Highway Traffic Safety Administration,* 793 F.2d 1322 (D.C.Cir.1986) (*CAS I* ), we determined that Congress, in enacting the Energy Policy Conservation Act (EPCA), removed prudential barriers to judicial review of claims arising under it. *Id.* at 1336. We

---

**3.** Section 313 provides:

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States Court of Appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business,

or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.

16 U.S.C. § 825*l* (b).

relied on the EPCA provision authorizing the filing of a petition for judicial review by "[a]ny person who may be adversely affected by any rule prescribed under [specified sections] ... of this title." 15 U.S.C. § 2004(a). As we noted, the language "places the EPCA alongside numerous statutes employing similar language, which courts have construed as granting broad standing." *CAS I*, 793 F.2d at 1336. We read the language "may be adversely affected" as a grant of standing broad enough to remove "the judicial authority to create prudential barriers." *Id.* at 1337.

Nonetheless, not every broad grant of standing eliminates prudential concerns. The Administrative Procedure Act (APA), for example, provides that any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" may seek judicial review. 5 U.S.C. § 702. Despite the APA's apparently generous review provision, the Supreme Court has held that prudential limitations apply to parties seeking review under section 702. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 394–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987); *see also Data Processing*, 397 U.S. at 153, 90 S.Ct. at 829. Because *Clarke* was decided after *CAS I*, there is some question about the continuing validity of our decision in *CAS I*. *See Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 921 (D.C.Cir.1989) (questioning whether *CAS I* "retains its vitality" after *Clarke*); *Competitive Enters. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 126 (D.C.Cir.1990) (Ginsburg, J., concurring) ("[T]he court's conclusion in *CAS I* that Congress intended to eliminate all prudential barriers to standing under EPCA no longer seems tenable."). Despite the questions, we have reaffirmed the holding in *CAS I*: "EPCA clearly removes the judicial authority to create prudential barriers by granting review of agency action to those 'who *may* be adversely affected.'" *Competitive Enters.*, 901 F.2d at 118 (quoting *CAS I*, 793 F.2d at 1337 (quoting 15 U.S.C. § 2004(a))) (emphasis added). Thus, while we must of course

adhere to Supreme Court precedent, it is equally clear that *CAS I* remains the law of this circuit.

In *Competitive Enterprises* we distinguished *Clarke* from *CAS I* on two grounds. First, we looked at the language of the APA, not the EPCA. "[T]he APA language ... construed [in *Clarke*] referred to the standing of a person 'adversely affected or aggrieved' by agency action, while EPCA speaks of one who 'may be adversely affected.'" *Competitive Enters.*, 901 F.2d at 118 n. 7. Second, we noted *Clarke*'s own admonition that *Clarke* applies only to the APA and should not be automatically applied to other statutes. *Id.* The second rationale applies with equal force here. The Supreme Court's interpretation of the APA is not to be transferred whole cloth to the Federal Power Act (FPA),[4] the statutory scheme under which Liquid Carbonic seeks review. *See* 16 U.S.C. § 825*l* (b). At the same time, however, the first rationale is absent here: the FPA review provision is not so broad as the EPCA. The EPCA speaks of a party who *may* be aggrieved; the FPA, on the other hand, authorizes judicial review for "[a]ny party ... aggrieved by an order issued by the Commission." *Id.* Thus, the FPA review provision is narrower than the EPCA review provision. It is also narrower than the APA. The APA permits review requested by a party "[1] suffering legal wrong because of agency action, or [2] adversely affected or [3] aggrieved by agency action." 5 U.S.C. § 702. The FPA permits review only if it is sought by a "party ... aggrieved."

■ The limited review language of the FPA compels us to apply prudential limitations to a party seeking review of a FERC order issued pursuant to PURPA. The second rationale relied upon in *Competitive Enterprises*, that the *Clarke* decision applies only to the APA, does not alter the conclusion. Just as prudential concerns apply to review conducted under the APA despite its broad language, the same concerns necessar-

---

4. PURPA amended certain sections of the FPA; review of FERC orders under either act is autho-

rized by 16 U.S.C. § 825*l*.

ily apply to review under the FPA with its not so broad language. Our conclusion is consistent with Supreme Court, and our own, precedent.

Before *CAS I* we occasionally concluded that Congress had eliminated prudential barriers to judicial review. *See, e.g., Consumers Union v. FTC,* 691 F.2d 575 (D.C.Cir.1982) (en banc) (per curiam), *aff'd,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983); *Gray v. Greyhound Lines, E.,* 545 F.2d 169 (D.C.Cir.1976). Whether those decisions survive the *Clarke* decision is not clear and we express no opinion on that question today. Whatever their vitality, however, they are distinguishable. In *Consumers Union,* we held that in the Federal Trade Commission Improvements Act of 1980 (FTCIA), Congress "intended to permit standing to seek judicial review to the full extent permitted by Article III." 691 F.2d at 576. But the FTCIA review provision was exceedingly broad: "any interested party may institute ... actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this section." 15 U.S.C. § 57a–l(f)(1) (current version at 15 U.S.C. § 57a(e)). As we noted elsewhere, this statute "specifically *requests* the courts to determine the statute's constitutionality as soon as possible." *Consumer Energy Council v. FERC,* 673 F.2d 425, 454 n. 122 (D.C.Cir.1982), *aff'd,* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). To the extent that the prudential standing barrier derives from a separation of powers concern, *see CAS I,* 793 F.2d at 1335, a congressional request for judicial review would seem to eliminate such concern. "Indeed, far from *preserving* the separation of powers, when Congress has spoken, the courts place themselves in conflict with the legislative branch if they *ignore* the statutory message." *Id.* at 1337.

Similarly, in *Greyhound Lines,* we found that Congress, in enacting Title VII, had "determined that standing should be granted to anyone who satisfies the constitutional requirements [of Article III]." 545 F.2d at 176. Title VII's review language—"a civil action may be brought ... by the person *claiming* to be aggrieved," 42 U.S.C. § 2000e–5 (emphasis added)—is quite broad. It is similar to the language of the EPCA: the EPCA authorizes judicial review by those who *may* be adversely affected; Title VII authorizes it if sought by those *claiming* to be aggrieved. To the extent that the word "may" distinguishes the EPCA from the APA, the word "claiming" has the same effect. The FPA review provision, however, is significantly narrower and thus distinguishable. As *Gray* and *Consumers Union* illustrate, our pre-*CAS I* precedent finding the prudential standing barrier eliminated is not in conflict with our decision today.[5]

Nor are we in conflict with relevant Supreme Court decisions. In *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the Court found that the judicial review language of section 810 of the Civil Rights Act of 1968 (commonly known as the Fair Housing Act) was "broad and inclusive." *Id.* Section 810 provides that "[a]ny person who *claims* to have been injured by a discriminatory housing practice or who *believes* that he will be irrevocably injured ... may file a complaint." 42 U.S.C. § 3610(a) (emphasis added). Again, the language closely resembles the permissive language of the EPCA, not the narrower language of the FPA. The Supreme Court has also held that section 812 of

---

5. In two other cases cited in *CAS I* we did not expressly find that Congress eliminated the prudential standing barrier but we did "interpret generous statutory provisions [so as] to grant broad standing." *CAS I,* 793 F.2d at 1337 n. 86. Like *Gray* and *Consumers Union,* those cases involved review provisions at least arguably broader than the FPA or the APA. The court in *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1005 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978), for instance, interpreted a review provision granting standing to "any party opposed to [the grant of a] ... permit." 16 U.S.C. § 1374(d)(6). Mere opposition to the grant of a permit does not necessarily entail actual injury. Similarly, in *Metropolitan Washington Coalition for Clean Air v. District of Columbia,* 511 F.2d 809, 814 (D.C.Cir. 1975), we found that the Clean Air Act's grant to seek review to "any citizen" was a "Congressional invitation to invoke judicial process," *id.* at 814, hardly the circumstance in which to apply a prudential standing limitation.

the Fair Housing Act, which provides that "rights granted by sections 803, 804, 805, and 806 may be enforced by civil actions in appropriate United States district courts," 42 U.S.C. § 3612, similarly removes any need for prudential standing scrutiny. The Court concluded that "§ 812 on its face contains no particular statutory restrictions on potential plaintiffs." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 103, 99 S.Ct. 1601, 1609, 60 L.Ed.2d 66 (1979); *see also Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982) (finding standing in those claiming violation of statutory right to truthful housing information). The FPA, by contrast, contains the statutory restriction that a party seeking review be aggrieved; it therefore imposes a prudential standing barrier that we must confront in assessing Liquid Carbonic's claim of standing.[6]

### III.

■ Our prudential standing inquiry uses a zone of interests test. "That test requires that we ask whether a would-be challenger to agency action is pursuing an interest 'arguably within the zone of interests' Congress intended either to regulate or protect." *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918, 922 (D.C.Cir.1989) (*HWTC IV*) (quoting *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). "There must be 'some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought.'" *Calumet Indus., Inc. v. Brock,* 807 F.2d 225, 228 (D.C.Cir.1986) (quoting *Copper & Brass Fabricators Council, Inc. v. Department of the Treasury,* 679 F.2d 951, 952 (D.C.Cir.1982)). A challenger whose claims would be "more likely to frustrate than to further statutory objectives" therefore lacks standing to pursue those claims. *HWTC IV,* 885 F.2d at 922 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12).

■ Parties regulated by a statute or those whom it protects fall within its "zone of interest." *Id.* No one disputes that the petitioner is not *regulated* by PURPA. Whether PURPA *protects* Liquid Carbonic's interests is another matter. "Litigants can qualify as 'protected' by a statute if they are intended beneficiaries of the legislation or are nevertheless what we have termed suitable challengers." *First Nat'l Bank & Trust Co. v. National Credit Union,* 988 F.2d 1272, 1275 (D.C.Cir.1993). We must determine, then, whether Liquid Carbonic is an intended beneficiary of PURPA or makes a suitable challenger of FERC action implementing PURPA.

Liquid Carbonic apparently believes it is an intended beneficiary of PURPA, at least insofar as it argues that "the 'zone of interest' sought to be protected by PURPA must include those parties interested in, or affected by, the Commission's efforts in effecting Congress' intent." Supplemental Brief of Petitioner at 7. If this is Liquid Carbonic's argument, it is without support. The intended beneficiaries of a statute cannot include any party interested in or affected by an agency's decision unless the zone of interest test is meaningless. This interpretation would confer standing on a larger group of claimants than the Constitution permits, an improbable result given that the zone of interest test is meant to narrow the field of potential challengers. The petitioner appears to want intended beneficiaries to include all incidental beneficiaries, an interpretation we reject.

Liquid Carbonic's status in this proceeding is as a competitor in the liquid CO2 market. It does not compete with the intervenors but only with their proposed thermal hosts. PURPA was not intended, however, to benefit such second-tier competitors. The statute expressly declares the interests of particular parties, including QFs, *see* 16 U.S.C. § 824a–3(a), state and federal agencies with rate-making authority for electric utilities, *see id.,* and electric utilities. *See id.* § 824a–3(b). It neither names nor implies an interest in the

---

**6.** Liquid Carbonic's belated assertion that it seeks review under the APA as well as the FPA, *see* Supplemental Brief of Petitioner at 8 n. 4, does nothing to alter our conclusion that the prudential standing limitation applies.

competitor of a thermal host. Nor does Congress's purpose in enacting PURPA—to reduce dependence on foreign oil, lessen the likelihood of natural gas shortages and control consumer costs—suggest that the competitor of a thermal host is an intended beneficiary, at least insofar as it alleges injury only as a competitor rather than as a consumer of electricity. Significantly, Liquid Carbonic makes no claim of injury as a consumer of electricity. Finally, Liquid Carbonic can point to no evidence in the legislative history of PURPA suggesting that a thermal host competitor is an intended beneficiary of the statute. There being no indication that Congress intended to benefit a second-tier competitor, Liquid Carbonic does not have standing as an intended beneficiary.

Nonetheless, Liquid Carbonic can establish standing if it is a suitable challenger of FERC's decisions certifying Lavair, AES WR and Polk. A party is a suitable challenger if its interests align systematically, not fortuitously, with the interests of those whom Congress intended to protect. *HWTC IV*, 885 F.2d at 924. Consequently, we must determine the nature of Liquid Carbonic's interests.[7]

As noted, Liquid Carbonic's interest in this case is as a second-tier competitor. More precisely, it is interested in maximizing its profits, apparently by avoiding competition with other manufacturers of liquid $CO_2$. Accordingly, Liquid Carbonic opposes the entry into the liquid $CO_2$ market of the thermal hosts of Lavair, AES WR and Polk. Despite Liquid Carbonic's assertions that FERC is failing to promote energy efficiency, however, it is clear that its interest has nothing to do with the energy conservation goals of PURPA.

Assuming Liquid Carbonic is correct that the production of liquid $CO_2$ by the flue gas method is inefficient, both as a matter of economics and of energy use, Liquid Carbonic's interest in this case would coincide with the interests to be served by PURPA: the encouragement of efficient uses of cogenerated energy and the concomitant discouragement of inefficient uses or waste. But any such alignment of interests is merely fortuitous. If a new technology was invented, making the production of liquid $CO_2$ from flue gas a highly efficient method, Liquid Carbonic would nonetheless object to the certification of any cogenerator whose thermal host would compete with it. Indeed, Liquid Carbonic would have more reason to object under those circumstances. If a flue method $CO_2$ producer not associated with a QF could compete with Liquid Carbonic in the free market, a flue method $CO_2$ producer affiliated with a QF could presumably underprice its product with the aid of a subsidy from the QF and thereby drive Liquid Carbonic out of the marketplace. Conversely, the less efficient the flue method becomes relative to standard methods of $CO_2$ production, the less likely Liquid Carbonic's objection to QF certification would be. If the QF could not subsidize the thermal host's production of $CO_2$ enough to make production feasible in the marketplace, Liquid Carbonic would have no reason to object to certification. Thus, the more efficient the use of cogenerated energy, the more interest Liquid Carbonic would have in objecting. Such an interest not only fails to coincide with the interests PURPA was intended to protect, it contradicts them.

Liquid Carbonic argues that this case is analogous to so-called entry-restriction cases, cases in which competitors have had great success in establishing standing. *See First Nat'l Bank*, 988 F.2d at 1277. The entry-restriction cases involve competitors attempting to confine a regulated party within certain statutory guidelines, although the reason a competitor wants to do so may have nothing to do with the interests the statute seeks to protect. Nevertheless, the restriction itself serves the statutory goal and therefore a competitor who seeks to enforce it generally has standing. Indeed, "[w]e take from these cases the principle that a plaintiff who has a competitive interest in confining a regulated industry within certain congressionally im-

---

**7.** It is important to recognize that the standing requirement "asks *who* may bring a particular challenge, not what particular challenges may be brought." *HWTC IV*, 885 F.2d at 925. Thus we must decide whether Liquid Carbonic's interest is a protected one regardless whether the specific challenge it makes in this case furthers the goals of PURPA.

posed limitations may sue to prevent the alleged loosening of those restrictions, even if the plaintiff's interest is not precisely the one Congress sought to protect." *Id.* Accordingly, Liquid Carbonic contends that it has standing as a competitor seeking to prevent the loosening of a statutory entry-restriction.

It is not at all clear, however, that these are similar to entry-restriction cases. Liquid Carbonic does not actually seek to prevent Lavair, AES WR and Polk from entering the electricity production market; it seeks to prevent their thermal hosts from entering the liquid $CO_2$ market. Moreover, Congress intended PURPA to encourage the development of cogeneration facilities. While the encouragement of the goal must, by its nature, limit entry to those who actually further the goal by producing useful energy, this does not necessarily mean that the statute is an entry-restricting one. We find standing in entry-restriction cases because we have "reason to think that a competitor's interest in patrolling a statutory picket line will bear some relation to the congressional purpose [behind the statute], because the entry-like restriction itself reflects a congressional judgment that the constraint on competition is the means to secure the statutory end." *Id.* at 1278. The relation between the competitor's interest and the congressional purpose is one of systematic alignment. As we have already found, however, Liquid Carbonic's interest is not systematically aligned with PURPA's goals and, in fact, contradicts them. Merely because it seeks to restrict entry into the liquid $CO_2$ market, Liquid Carbonic is not a suitable challenger of FERC action implementing PURPA.

Prudential standing limits apply to parties seeking to establish standing based on a violation of PURPA. Liquid Carbonic is not regulated by PURPA and cannot show that it is within the zone of interests sought to be protected by the statutory scheme. Liquid Carbonic's petitions are, therefore,

*Denied.*