MOUNTAIN STATES LEGAL
FOUNDATION, et al.,
Plaintiffs,

v.

Daniel R. GLICKMAN,[1] Secretary of the
United States Department of Agri-
culture, et al., Defendants.

Civil No. 92–0097 (RCL).

United States District Court,
District of Columbia.

April 18, 1995.

---

**1.** Federal Rule 25(d)(1) provides that "[w]hen a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party." Fed.R.Civ.P. 25(d)(1). ·

Daniel R. Glickman, Allison B. Rumsey, U.S. Dept. of Justice, Washington, DC, for defendants.

William Perry Pendley, Mountain States Legal Foundation, Denver, CO, for plaintiffs.

### *MEMORANDUM OPINION*

LAMBERTH, District Judge.

This case comes before the court on cross-motions for summary judgment. Upon consideration of the plaintiffs' and the defendants' motions, oppositions thereto, and materials submitted by the parties in support of their positions, the defendants' request for summary judgment on counts I, II and IV of the first amended complaint will granted and the plaintiffs' motion will be denied.

## I. Introduction

### A. Summary Judgment Standard

The court decides defendants' and plaintiffs' motions for summary judgment under Fed.R.Civ.P. 56(b). The parties have had a "reasonable opportunity to present all material made pertinent to [the] motion by Rule 56," *Neal v. Kelly,* 963 F.2d 453, 456 (D.C.Cir.1992), and the parties have submitted affidavits and other materials pertinent to the dispute. Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *E.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

## B.  Background

Plaintiff Mountain States Legal Foundation ("MSLF") is a voluntary, nonprofit, public interest corporation organized under the laws of Colorado.  It alleges that its members use the National Forests as a source of income and for recreational activities.  John Hossack alleges standing as a member of MSLF.  He currently works as an independent forest consultant and is hired by private individuals and companies to advise, assist in purchasing timber, interpret contracts and to review Environmental Impact Statements ("EIS").  He alleges that the implementation of Alternative 9A of the EIS at issue in this case will result in a loss of jobs.  Plaintiff Communities for a Great Northwest ("CGN") is also a voluntary, nonprofit corporation and is organized under the laws of Montana.  It also alleges its members use the National Forests as a source of income and for recreational activities.  Bruce Vincent asserts standing as a member of CGN.  Vincent owns a small logging company which has been forced to serve as a subcontractor to a larger mill while downsizing its operation since the limitations in timber harvest in the mid-eighties.  Plaintiff Owens & Hurst is a lumber corporation organized under the laws of Montana with its principal place of business in Eureka, Montana.  It purchases approximately one third of its timber from the supply that comes from the Upper Yaak River Drainage.  Its owner, James Hurst claims that Forest Service action caused the temporary closure of his business and the permanent layoff of 25 employees.

Plaintiffs are suing the Secretary of the United States Department of Agriculture, the Chief of the United States Forest Service ("Forest Service"), the Forest Service (which is subject to the authority of the Department of Agriculture), the Forest Supervisor of the Kootenai National Forest, the Secretary of the Interior, the Regional Director of Region VI of the United States Fish and Wildlife Service and the Fish and Wildlife Service (who are subject to the authority of the Department of the Interior).  The Wilderness Society, American Wildlands, and the Sierra Club intervened as defendants.  Each are environmental organizations with an active interest in the management of the Kootenai National Forest.

Plaintiffs ask the court to stop the implementation of Alternative 9A and force the implementation of Alternative 6 set forth in the EIS for the Upper Yaak River Area.

A series of events and legal actions have formed the historical basis for the current suit.  In August 1983, the Save the Yaak Committee sought an injunction against reconstruction of the Porcupine–Sullivan section of Highway 92 asserting that the United States Department of Agriculture Forest Service had violated the Endangered Species Act ("ESA") 16 U.S.C. §§ 1531 *et seq.* by failing to comply with the National Environmental Policy Act ("NEPA") 42 U.S.C. § 4321 *et seq.*  That specific area is not at issue in this case but was considered part of the cumulative effects combined with the decision area of this case.  The District court dismissed plaintiffs' claim, *Vance v. Block,* 635 F.Supp. 163 (D.Mont.1986), but the Ninth Circuit Court of Appeals reversed, stating that the Forest Service had failed to consider the cumulative and connected actions.  *Save the Yaak Committee v. Block,* 840 F.2d 714, 721 (9th Cir.1988).  An injunction was issued against further timber sales until NEPA deficiencies had been corrected.  *Id.* at 722.

The Draft EIS for the Upper Yaak area was issued and·presented for public review in May 1989.  The EIS decision area at issue in this case was limited to 360 timber harvest units located within a 284,432–acre land area in the Upper Yaak area in the Northern Region of the Kootenai National Forest.  The Draft EIS was designed to consider and evaluate the environmental consequences of each alternative to the proposed timber harvest.  The purpose of the proposed action was to "re-establish timber harvesting and road construction in the Upper Yaak River . . . and to reduce, as much as possible, the mortality occurring in the lodgepole pine because of the mountain pine beetle infestation."  United States Department of Agriculture Forest Service, Upper Yaak Record of Decision, August, 1990, 3.  The Forest Service also noted the local concern for increased risk of wildfire caused by failure to

remove dead and dying timber in a timely manner. *Id.* After a series of meetings and reviewing 568 written responses and forms and over 1800 separate statements, the Forest Service issued the Final Environmental Impact Statement ("FEIS") in April 1990. United States Department of Agriculture, Forest Service, Upper Yaak Final Environmental Impact Statement, April 20, 1990.

The FEIS contains as an evaluation of the 14 different alternatives presented to the Forest Service with consideration of the following issues: Lodgepole Pine harvest affected by the Mountain Pine Beetle, timber management and harvest methods, economic effects, wildlife and threatened and endangered species, recreation, visual quality, road construction/reconstruction and road management, water quality, and risk of wildfire.

· The U.S. Fish and Wildlife Service pursuant to the request for the required formal consultation under the Endangered Species Act, 16 U.S.C. § 1536(a)(2), issued a biological opinion. United States Department of the Interior Fish and Wildlife Service Biological Opinion addressing Alternatives 6 and 9A, June 20, 1990. "It is the Service's biological opinion that timber harvesting outlined under Alternative 6 is likely to jeopardize the continued existence of the grizzly bear and that timber harvesting under Alternative 9A is not likely to jeopardize the grizzly bear." Biological Opinion at 1.

On January 10, 1992, the current plaintiffs in conjunction with plaintiffs no longer party to this suit filed a complaint in this court alleging that the implementation of Alternative 9A violated a series of environment statutes including the Organic Act, 16 U.S.C. §§ 473–478, 479–482, 551; Resource Planning Act ("RPA"), 16 U.S.C. §§ 1600–1687; National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1614; National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.;* Multiple–Use Sustained–Yield Act ("MUSYA") 16 U.S.C. §§ 528–531; and the Endangered Species Act ("ESA") 16 U.S.C. §§ 1531 *et seq.* Plaintiffs also allege that defendants violated the Administrative Procedures Act ("APA") 5 U.S.C. § 706(2)(E), (F). Only counts I, II, and IV concerning, alleging violation of the

Organic Act, NFMA, MUSYA, and the APA, remain. The other counts were dismissed due to lack of standing. *Mountain States Legal Found. v. Madigan,* No. 92–0097 (D.D.C., Sept 15, 1992); *Mountain States Legal Found. v. Madigan,* No. 92–0097, 1992 WL 613292 (D.D.C., May 7, 1992).

## II.   Standing

### A.   Article III Requirements

#### 1.   Standard of Review

■   Standing in this case is controlled by *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The plaintiffs have the burden of proving the following elements. "First, the plaintiff must have suffered an injury in fact-an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not ... the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 2136. (citations omitted)

#### 2.   Analysis

■   This court holds that plaintiffs' claims in counts I, II and IV of the first amended complaint must be dismissed due to lack of standing for the following reasons.

##### a.   Injury in Fact

Plaintiffs assert both economic and aesthetic injuries. However, in reviewing plaintiffs' affidavits, the court finds that plaintiffs' asserted injuries are in fact only economic. The court reaches this conclusion because each of the members representing the plaintiffs allege harm to only their respective businesses.

Plaintiffs, therefore, lack standing because the Organic Act,[2] MUSYA[3] and NFMA[4] do not provide a legally cognizable economic interest in a specified level of timber harvest. At the same time, the statute grants the Secretary of Agriculture discretion to determine harvest level. 16 U.S.C. § 1611(a); see also *Region 8 Forest Serv. Timber Purchasers v. Alcock*, 993 F.2d 800, 808 (11th Cir. 1993). In passing these statutes, Congress intended to set a ceiling rather than a floor when it allowed the Secretary of Agriculture and the National Forest Service to determine harvest levels. *Swan View Coalition, Inc. v. Turner*, 824 F.Supp. 923, 935 (D.Mont.1992). Furthermore, MUSYA specifically prohibits the Forest Service from managing resources for the purpose of obtaining the highest economic return. 16 U.S.C. § 528. Finally, however, Alternative 9A still authorizes a substantial amount of harvest.[5]

2. The Organic Act, 16 U.S.C. § 475, provides that "[n]o national forest shall be established except to improve and protect the forest within the boundaries, or for the purpose of securing timber for the use and necessities of citizens of the United States."

3. The Multiple–Use Sustained Yield Act, 16 U.S.C. §§ 528–531 provides:

It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed and wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 47 of this title.
Section 531 defines the following terms:
(a) "Multiple use" means: The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, and not necessarily the combination of the uses that will give the greatest dollar return or the greatest unit output.
(b) "Sustained Yield of the several products and services" means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various

Second, plaintiffs lack standing because their alleged injury is not imminent. Plaintiffs argue that, under Alternative 9A, the Mountain Pine Beetle infestation will cause dead and dying trees to erupt in a massive wildfire that will destroy the entire forest. The possibility of such a fire in comparison with the risk under Alternative 6 is mere speculation. First, Alternative 6 reduces the fuel acres (the amount of highly combustible timber) by 14.2% while Alternative 9A reduces it by 5.4%. Plantiffs offer no evidence that this difference of 8.8% will make a wildfire substantially more imminent with the adoption of 9A. This is further evidenced in the FEIS, which notes that the risk of wildfire is primarily controlled through restrictions on harvest activities, and control of public access to areas with accumulating fuels in addition to management of fuels that feed the fire. FEIS III–40. Moreover, oth-

renewable resources of the national forests without impairment of the land.

4. The National Forest Management Act includes 16 U.S.C. §§ 1600–1614. The relevant provisions are quoted below.

Section 1604(e) provides:
In developing, maintaining, and revising plans for units of the National Forest System pursuant to this section, the Secretary shall assure that such plans—
(1) provide for multiple use and sustained yield of products and services obtained therefrom in accordance with the Multiple–Use Sustained–Yield Act of 1960 [16 U.S.C.A. §§ 528–531], and, in particular include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness; and
(2) determine forest management system, harvesting levels, and procedures in the light of all of the uses set forth in subsection (c)(1) of this section, the definition of the terms "multiple use" and "sustained yield" as provided in the Multiple–Used Sustained–Yield Act of 1960, and the availability of lands and their suitability for resource management.
Section 1611(a) provides that "[t]he Secretary of Agriculture shall limit the sale of timber from each national forest to a quantity equal to or less than a quantity which can be removed from such forest annually in perpetuity on a sustained-yield basis."

5. Alternative 9A created a total of 208 timber harvest units which was 57% of the past 35–year annual harvest average available for the local economy. FEIS at II–24. Alternative 6 would have created 263 timber harvest units which was 76% of the past 35–year annual harvest average. FEIS at II–18.

er key elements in wildfire suppression include available firefighting forces, weather, fuels and terrain. FEIS IV–148. Consequently, the moist climate, good road access, fire detection and suppression programs have resulted in a minimal loss of timber resources by wildfire in recent years. FEIS at III–40. Finally, according to the FEIS, the Mountain Pine Beetle infestation is on a steady decline and the report estimated that it was only likely to continue for a few years following the report's issue in 1988. FEIS at III–66.

### b. Causation

The plaintiffs' alleged injury is not fairly traceable to the defendants' action. Referencing the immediately preceding discussion, plaintiffs' alleged injuries are not fairly traceable to the defendant's action because there is no evidence that the defendants' action will cause a significantly increased risk of wildfire.

### c. Redressability

The plaintiffs also lack standing because their alleged injuries will not be redressed by a decision favorable to plaintiffs for the following reasons. First, as discussed above, a wildfire will not necessarily be prevented if Alternative 6 were selected.

Second, the plaintiffs' requested relief would violate the Endangered Species Act. The Forest Service is required to comply with other relevant statutes in implementing any alternative. *Seattle Audubon Society v. Evans,* 952 F.2d 297 (9th Cir.1991). The Fish and Wildlife Service reclassified the Cabinet Yaak grizzly bear from a threatened to an endangered species in 1993. Notice of 12–month Petition Finding, 58 Fed.Reg. 8250–51 (1993). The ESA requires that the Secretary of the Interior insure that any action authorized, funded or carried out by the agency does not jeopardize the continued existence of any threatened or endangered species unless an exemption is granted. 16 U.S.C. § 1536(a)(2). An exemption may be granted only if there is no reasonable and prudent alternative to the agency action. 16 U.S.C. § 1536(h)(1)(A)(i). Therefore, plaintiffs' sought remedy could not be implemented. The Forest Service would then be forced to reconsider only the other options which

would not jeopardize the Cabinet Yaak grizzly bear which may not necessarily redress plaintiffs' alleged injury.

Finally, even if Alternative 6 could be implemented, plaintiff Owen and Hurst would not be guaranteed any right to purchase the timber.

### III. Merits

Even if plaintiffs had standing, this court would dismiss plaintiffs' claims on the merits.

### A. Standard of Review

■ In deciding whether to overturn agency action, this court must apply the standard set forth in 5 U.S.C. § 706(2)(A) ("The reviewing court shall hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414–415, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). Because this case involves resolution of primarily factual issues which require substantial agency expertise, the court must "defer to the informed decision of the responsible federal agencies." *Id.* at 376–377, 109 S.Ct. at 1861 (citations omitted).

■ In determining whether agency action is arbitrary and capricious, "a reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. ... The agency must articulate a rational connection between the facts found and the choice made. While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Bowman Transport, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285–286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1975) (quoting *Volpe,* 401 U.S. at 414–15, 91 S.Ct. at 822–23). (Citations omitted).

■ This standard affords great deference to agency decisions and presumes that agency action is valid. *Motor Vehicle Mfrs. v. Ruckelshaus,* 719 F.2d 1159, 1164 (D.C.Cir. 1983). District courts have also held that the Forest Service has wide discretion to weigh and decide the proper uses within any area of the National Forests. *See Big Hole Ranchers v. U.S. Forest Service,* 686 F.Supp. 256, 264 (D.Mont.1988); *National Wildlife Federation v. U.S. Forest Service,* 592 F.Supp. 931, 938 (D.Ore.1984); *Sierra Club v. Hardin,* 325 F.Supp. 99, 123 (D.Alaska 1971).

### B. Analysis

#### 1. Arbitrary and Capricious

■ With regard to Counts I, II and IV, plaintiffs contend that the Forest Service's selection of Alternative 9A was arbitrary and capricious on two accounts. First, plaintiffs argue that the Forest Service used an untested water yield model revealing that Alternative 6 did not meet the Forest Plan Yield Guidelines which establish allowable peak flows. FEIS at IV-35. Second, plaintiffs also argue that it failed to consider the effect of wildfires on the grizzly bear habitat.

With regard to the water yield model, plaintiffs' own exhibit reveals that the Forest Service did not use the R1-R4 model which plaintiffs claim is untested and plaintiffs drew their arguments from documents explaining why the R1-R4 model was rejected. Instead plaintiffs used the Clearcut Equivalent Area Model that compares peak flows generated by harvest related activities. FEIS at IV-35. Plaintiffs present no evidence as to why the court should presume that the Forest Service's conclusion was arbitrary and capricious.

Second, it is clear that the Forest Service was well aware of the effects of the wildfire on the grizzly bear habitat when it stated that in the FEIS that "wildfire has the potential to affect many natural resources including soil, plant, succession, air quality, water, microclimate, wildlife and fish." It continued that the effects of wildfires can be both beneficial and destructive. FEIS at IV-147. Moreover, the FEIS included extensive analysis of the effect of each alternative on wildlife, the effect of Mountain Pine Beetle infestation on the fuel load and the overall risk of wildfire. FEIS at III-38, 40, IV-147, IV-147.

Therefore, this court concludes that the Forest Service was not arbitrary and capricious in the selection of a water-yield model and when it considered the risk of wildfire to the grizzly bear.

#### 2. Organic Act, MUSYA and NFMA

■ In counts I and II of the first amended complaint, plaintiffs allege that defendants violated the Organic Act, MUSYA and NFMA.

Plaintiffs argue that the primary purpose of these statutes is to require the Forest Service to secure a continuous supply of timber and that Alternative 9A fails to do this by not adequately addressing the potential for wildfire caused by the Mountain Pine Beetle infestation.

Plaintiffs incorrectly rely on *United States v. New Mexico,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978) in interpreting these statutes. Plaintiffs assert that *New Mexico* stands for the proposition that the purpose of the National Forest System is to provide a continuous supply of timber. This is an incorrect interpretation of that case. There, the Court held that the United States may not extend the implied reservation of water doctrine beyond the scope of the Organic Act. *Id.* at 713, 98 S.Ct. at 3020. In other words, the federal government only has a right to water for purposes of securing a continuous supply of timber and securing favorable conditions for water flows. Access to water for purposes of recreation, aesthetics, wildlife preservation and cattle grazing are governed by state law. The Court stated:

"While we conclude that the Multiple-Use Sustained-Yield Act of 1960 was intended to broaden the purposes for which national forests had previously been administered, we agreed that Congress did not intend to thereby expand the reserved rights of the United States." *Id.* at 713, 98 S.Ct. at 3020. The Court recognized that the Forest Service is governed by the multiple-use sustained yield

standard in administering forests, which is at issue in this case.

Additionally, the plain language of the statutes reflect congressional intent to direct the Forest Service to administer according the multiple-use sustained-yield standard. 16 U.S.C. §§ 528, 529 and 530; 16 U.S.C. §§ 1604(e) and 1607.

Plaintiffs then contend that defendants ignore the purpose of insuring a continuous supply of timber. This is an improper characterization of defendants' action. The Forest Service clearly recognized the importance of timber harvesting to this area. FEIS at I–7, IV–311–317. It also considered the risk of wildfire caused by the Mountain Pine Beetle and how these factors affect the grizzly bear habitat. FEIS at III–38 and 40, IV–147, 148. Plaintiffs state that the only way to control the Mountain Pine Beetle infestation is by harvesting timber. The only evidence to support this claim is an affidavit by a member of one of the organizations bringing this suit. This is not sufficient to overcome the deference granted to the agency.

In Count IV, plaintiffs argue that defendants have violated several NFMA regulations. This court finds that the plaintiffs have offered no evidence indicating that the defendants have failed to comply with NFMA regulations.

## IV. Conclusion

This court holds that Counts I, II and IV of the first amended complaint will be dismissed due to lack of standing. Furthermore, plaintiffs' claims would be also be dismissed on the merits if plaintiffs had been able to meet the standing requirements.