**CALIFORNIA FORESTRY ASSOCIATION, et al., Plaintiffs,**

v.

**Jack Ward THOMAS et al., Defendants,**

**Natural Resources Defense Council, Defendant–Intervenor.**

**Civil Action No. CA 94–589.**

United States District Court, District of Columbia.

Aug. 27, 1996.

---

Steven P. Quarles, J. Michael Klise, Crowell & Moring, Washington, DC, for Plaintiffs.

Andrea Berlowe, Keith Saxw, U.S. Department of Justice, Environmental and Natural Resources Division, General Litigation Section, Washington, DC, Johanna H. Wald, Andrew Caputo, Natural Resources Defense Council, San Francisco, CA, for Defendants.

## MEMORANDUM OPINION

KESSLER, District Judge.

This case is a challenge to a decision by the U.S. Forest Service to implement Interim Guidelines as a part of a program designed to protect the spotted owl's habitat in California's Western Sierra Nevada national forests. A number of private timber companies, a trade association, and one local county allege economic and environmental injuries and bring claims under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* (1988), and the National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.* The Natural Resources Defense Council, an environmental protection group, has been granted permission to intervene.[1] This matter is before the Court on the parties' cross-motions for summary judgment.

## I. Statement of Facts and Procedural History

The California subspecies of the spotted owl makes its home in mature timber stands of mixed conifer forests in the Sierra Nevada and southern California.[2] Since the 1970s, the California spotted owl has been designated by the Forest Service as a "sensitive species" in National Forests throughout California. As a result, the Forest Service has taken periodic surveys and inventories of spotted owl sites since the early 1970s.[3]

The owls typically nest in large, old and decaying trees, so the Forest Service has been concerned primarily with the impact of logging on the owls' habitat. In 1984, the Forest Service established a network of "spotted owl habitat areas" (SOHAs) in the national forests in the Sierra Nevada. In general, the Forest Service required that each such SOHA contain 1,000 acres of suitable spotted owl habitat, and that SOHAs be located between 6 and 12 miles apart.[4]

Despite these efforts to protect the owl's habitat, the Interagency Scientific Committee ("ISC") reported in 1990 that the SOHA strategy was not protecting the spotted owl. Specifically, the ISC concluded that the SOHA strategy had a low probability of maintaining the current owl population because it resulted in relatively isolated "is-

1. For ease of reference, the Court refers to both parties as "Defendants."

2. The term "mature timber strand" refers to an area of the forest characterized by (1) a multistoried canopy with 70 percent or greater total cover, (2) 40 percent or more of the total canopy trees at least 21 inches in diameter at breast height, and (3) extensive decadence—cavities, broken tops, snags, and so on." AR at 11.

3. An owl site is an area of unspecified dimensions where a single owl or a pair of owls has been located, usually repeatedly. AR at 10.

4. The regional guide defined "suitable" owl habitat as including relatively large trees (greater than 21 inches in diameter), relatively closed forest canopy, and the presence of standing dead trees (snags) and dead trees on the forest floor. As defined, a suitable owl habitat consists largely of old growth forests, which the owls prefer. Int.Exh. 1 at H–1 to H–2.

lands" of suitable habitat, surrounded by a "sea" of younger, unsuitable habitats.

Therefore, in June 1991, the Forest Service formed the Interagency California Spotted Owl Steering Committee ("Steering Committee") to develop an alternative strategy for managing the owls' habitat. The Steering Committee included several State of California and Federal organizations, and observers who represented various environmental and timber industry groups. The Steering Committee formed two investigative teams: (1) the California Spotted Owl Technical Assessment Team ("Technical Team") and the Policy Implementation Planning Team ("PIP Team"). The Technical Team was formed to generate a biological report on the owl ("CASPO Report"), while the PIP Team was formed to evaluate the methods for implementing the directions of the Technical Team. The Forest Service also initiated a "Cumulative Effects Analysis" ("CEA"), designed to evaluate what the potential effects of logging in owl habitats would be while the Technical Team was completing its assessment and report for the Forest Service. AR at 21.

On May 8, 1992, the Steering Committee's Technical Team issued the CASPO report. The Team agreed with the ISC that the existing SOHA management was "not a workable strategy to assure long-term maintenance of spotted owls." AR at 21. The Team found that the California spotted owl selectively used large trees for nesting, and that the "key elements of spotted owl nest and roost stands, under current LMPs [Land Management Plans], will decline sharply over most of the Sierra Nevada in the next few decades." AR at 17. The CASPO report recommended that the Forest Service adopt an interim management plan to preserve future "management options" for Sierra Nevada owls. Specifically, the CASPO team said that the Forest Service should preserve older

forest elements that the owls appeared to need for nesting and roosting, and reduce the build-up of surface and ladder fuels that increased the risk of fire. Most significantly for this case, the CASPO team recommended that the Forest Service adopt a no-logging policy within "protected activity centers" surrounding spotted owl nest sites and protect all live trees greater than 30 inches in diameter. See AR at 26–28. This interim management plan developed into the Interim Guidelines being challenged in this case.

In June, 1992, on the heels of the CASPO Report, the Pacific Southwest Region of the Forest Service announced that it intended to amend its Regional Guide and forest plans for the ten affected forests within the region by adopting the Interim Guidelines.[5] According to the Forest Service, the CASPO report "clarified the need to reexamine current management and develop interim direction" for protecting the owl and its habitat pending completion of the Steering Committee's work. 57 Fed.Reg. 27019. The Forest Service published a notice in the Federal Register soliciting comments from the public on the Interim Guidelines set forth in the CASPO Report. During the six month notice and comment period, the Forest Service received over 400 comments from the public on the proposed Guidelines.

Six months later, in January, 1993, the Forest Service released an Environmental Assessment ("EA") of the Interim Guidelines and adopted the Guidelines effective March 1, 1993.[6] Their stated purpose was "to bridge the time gap between the current obsolete strategy and the longer-term strategy" for managing the owl. AR 707. Shortly thereafter, the Plaintiffs appealed the Decision Notice. Their appeal was rejected on October 27, 1993.

On March 21, 1994, six private timber producers, a council of timber producers, and a county, brought this action, claiming that the

---

5. Forest plans are prepared pursuant to the National Forest Management Act of 1976 ("NFMA"), which amended the Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. §§ 1600 et seq. The NFMA directs the Forest Service to manage each national forest in accordance with a land and resource management plan. 16 U.S.C. § 1604.

6. The Interim Guidelines were officially adopted through a "Decision Notice" which explained the Forest Service's decision and a "Finding of No Significant Impact" ("FONSI") on the environment.

Forest Service had violated the National Environmental Policy Act (NEPA), the National Forest Management Act (NFMA) and the Administrative Procedure Act (APA), by adopting and implementing the Interim Guidelines. The parties have filed cross motions for summary judgment.

## II. *Standing*

■ Defendants contend that Plaintiffs lack standing under Article III of the Constitution and under the prudential "zone of interests" test established by the Supreme Court in *Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The party seeking to invoke federal court jurisdiction bears the burden of establishing standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) ("*Defenders*").

### A. Constitutional Standing

■ To demonstrate standing under Article III, a party must meet three requirements. First, the party must demonstrate that it has suffered an injury in fact—an "invasion of a legally-protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical." *Defenders*, 504 U.S. at 560, 112 S.Ct. at 2136 (citations and internal quotation marks omitted). Second, there must be a "causal connection between the injury and the conduct complained of." *Id.* Finally, it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561, 112 S.Ct. at 2136 (citations omitted).

Defendants contend first that Plaintiffs cannot show an "actual, concrete, and particularized injury." Fed.Br. at 11. Specifically, Defendants argue that because the Interim Guidelines affect only the general vicinity (*i.e.*, the National Forests of the Pacific

Southwest Region) in which the Plaintiffs harvest timber, they have suffered insufficient injury to demonstrate standing under Article III. Further, Defendants assert that even if Plaintiffs could demonstrate injury, they would not have standing under Article III because they cannot demonstrate a "causal connection" between the injury and the conduct complained of. Finally, Defendants argue that Plaintiffs cannot demonstrate that a favorable decision by this Court would redress the harm they suffer because their potential economic injury is "purely conjectural." Fed.Br. at 13.

Plaintiffs respond that the Guidelines cause them economic, environmental and procedural injury, and that there is a causal connection between their injuries and the government's conduct.[7] Specifically, Plaintiffs assert that the Interim Guidelines reduce timber volumes that are available for sale by the Forest Service and harvest by Plaintiffs. Plaintiffs allege that this will ultimately drive up the price of timber, which will damage their economic well-being, as well as the quality-of-life of lumber-dependent communities. Moreover, Plaintiffs assert that the Guidelines are environmentally unsound because they will increase the risk of disease and wildfire in the affected areas. Plaintiffs argue that a favorable ruling by this Court will redress their injuries because striking down the Guidelines will reduce restrictions on timber harvesting, do less damage to the environment, and force the agency to comply with the procedural commands of NFMA and NEPA, the statutes which the agency allegedly violated.

■ Plaintiffs' future economic injury satisfies the injury in-fact requirement. "Government acts constricting a firm's supply of its main raw material clearly inflict the constitutionally necessary injury." *Mountain States Legal Foundation et al. v. Glickman*, 92 F.3d 1228, 1233 (D.C.Cir.1996).[8]

---

7. Plaintiffs also allege "quality of life" injury to those communities which will be adversely affected by decreased timber sales. Since this injury is entirely derivative of Plaintiffs' alleged economic injury, and for ease of reference, the Court will simply refer to the economic injury.

8. Plaintiffs' alleged environmental and procedural injuries do not meet the injury-in-fact require-

ment. As the Court discusses in greater detail *infra,* the alleged environmental injury is far too speculative to meet the injury in-fact requirement because the Interim Guidelines will not cause "demonstrably increased risk" to the forest. *Florida Audubon Society et al. v. Bentsen*, 94 F.3d

However, Plaintiffs still fail to satisfy the standing requirements because they are unable to show that their injury will be redressed by a favorable decision of this Court. Under the redressability test, "it must be 'likely,' as opposed to merely 'speculative,' that the injury claimed will be redressed by a favorable decision." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136 (*quoting Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–26, 48 L.Ed.2d 450 (1976)).[9]

Plaintiffs cannot make this showing because it is entirely speculative whether the injunction Plaintiffs seek would either prevent or remedy their alleged injuries. Plaintiffs argue that enjoining the Interim Guidelines will redress these injuries because timber harvest will be restored to pre-Interim Guideline levels. But that is not necessarily the case, given the fact that the Department of Agriculture retains full authority to determine the quantity of timber it will allow to be sold, if any, from the National Forests. 16 U.S.C. § 472a; 36 C.F.R. §§ 219.16 & 219.3; *cf. Swan View Coalition, Inc. v. Turner,* 824 F.Supp. 923, 935 (D.Mont.1992) (Forest Plan objectives "simply represent a ceiling on timber production and do not mandate that such quantities actually be harvested").[10]

Thus, whether enjoining the Interim Guidelines would result in greater timber availability is pure conjecture, and therefore an inadequate basis upon which to base standing. *See Region 8 Forest Serv. Timber Purchasers v. Alcock,* 993 F.2d 800, 808 (11th Cir.1993) (standing denied because relief requested by timber groups—setting aside temporary, environmentally-protective measures and returning to previous policy—was too speculative); *Cf. ASARCO Inc. v. Kad-*

*ish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (denying standing where question of whether injury would be redressed by favorable decision depended "upon the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict").

The fact is, even if this Court granted Plaintiffs all the relief they requested and enjoined the Interim Guidelines, the Forest Service could still, independently, preclude the Plaintiffs from cutting down *any* trees around the owl habitat. 16 U.S.C. § 1611(a) (Forest Service must "limit the sale of timber from each national forest to a quantity *equal to or less than* a quantity which can be removed from such forest annually in perpetuity on a sustained yield basis") (emphasis added); 16 U.S.C. § 1604(g)(3)(E)–(F) (timber may be harvested from national forests only under certain circumstances); *see Intermountain Forest Industry Ass'n v. Lyng,* 683 F.Supp. 1330, 1340 (D.Wyo.1988) (amount of timber sales left to the Secretary's discretion to carry out the multiple-use concept). Plaintiffs' assumption that, in the absence of the Interim Guidelines, the Forest Service would automatically offer timber sales in the protected areas at the pre-Guideline volume, is unfounded. Thus, whether their injuries would be redressed by a favorable decision by this Court is more "speculative" than "likely." *Defenders,* 504 U.S. at 560, 112 S.Ct. at 2136 (*quoting Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38 & 43, 96 S.Ct. 1917, 1924 & 1926, 48 L.Ed.2d 450 (1976)).[11]

Plaintiffs argue further that even if redressability defeats their standing based on

---

658, 665 (D.C.Cir.1996). Moreover, Plaintiffs' procedural injury, standing alone, does not satisfy the injury-in-fact requirement. *Id.* at 664–665.

**9.** In *In re Thornburgh,* 869 F.2d 1503, 1511 (D.C.Cir.1989), the Court of Appeals declared that the redressability inquiry was simply whether, if plaintiffs secured the relief they sought, it would redress their injury.

**10.** In *Mountain States,* 92 F.3d at 1233, the Court of Appeals concluded that the plaintiffs

need not have any particular right to federal timber contracts. However that conclusion was reached in the context of deciding whether plaintiffs had suffered injury-in-fact. The Court did not address that issue in the context of redressability of injury, even though the District Court specifically relied on that ground for denying standing. *Mountain States Legal Foundation v. Glickman,* 922 F.Supp. 628, 633 (D.D.C.1995).

**11.** The record contains no indication of what the Forest Service would do if the Plaintiffs prevail.

economic injury, they may still bring this suit based on their "procedural injury." This argument is based on the Supreme Court's statement in *Defenders* that a plaintiff who has "been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability." 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7. While it is certainly true that NEPA gives rise to a procedural right, *City of Los Angeles v. NHTSA*, 912 F.2d 478, 492 (D.C.Cir.1990), the more difficult question is whether the procedural injury that flows from that right is sufficient to confer standing.

The precise meaning of the Supreme Court's footnote 7 in *Defenders* has been a subject of controversy since the opinion issued in 1992. *See e.g.* Cass R. Sunstein, *What's Standing After Lujan? Of Citizen Suits, "Injuries," and Article III*, 91 Mich. L.Rev. 163, 206 (1992) ("On the question of redressability, there was no majority for the Court. Three justices saw no problem with redressability; two Justices refused to speak to the issue; four Justices found a constitutional defect. Because no majority spoke, the *Lujan* case has little precedential value."); Brian J. Gatchel, *Informational and Procedural Standing After Lujan v. Defenders of Wildlife*, 11 J.Land Use & Envtl.L. 75, 99 (1995) (providing a comprehensive discussion of the issue and arguing that "*Defenders* provides little guidance, other than the language in the footnote itself, for the more standard situations where plaintiffs complain of violations of procedural rights"). Just recently however, in *Florida Audubon Society et al. v. Bentsen*, 94 F.3d 658, 665 (D.C.Cir. 1996) ("*Florida Audubon*"), our Court of Appeals spoke to the precise issue, and that case must, of course, guide our analysis.

In *Florida Audubon*, the Treasury Department authorized a tax credit for the use of a particular alternative fuel additive known as "ETBE." [12] *Id.* at 662. The Secretary did not prepare an Environmental Impact Statement, and appellants sued to permanently enjoin enforcement of the rule allowing the tax credit and to require the Secretary to prepare an EIS. Appellants argued that they suffered injury-in-fact because the tax credit would damage the environment by increasing the market for ETBE, thereby stimulating production of the corn, sugar cane and sugar beets necessary to make the ethanol from which ETBE is derived. This increased crop production would, in turn, necessarily result in more agricultural cultivation, with its accompanying environmental dangers, in regions that border wildlife areas appellants used and enjoyed. *Id.* at 662–663.

Our Court of Appeals rejected these arguments, and held that the appellants lacked standing because they had demonstrated "neither a personal injury nor an injury fairly traceable to the challenged acts of the Secretary." *Id.* at 662. Turning to the appellants' alleged "procedural injury" (the Secretary's failure to prepare an EIS), the Court stated that to sue for a "procedural violation" of a statute, a plaintiff must show that the government act "performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Id.* at 664. Thus, the mere violation of a procedural requirement "does not permit any and all persons to sue to enforce the requirement." *Id.* More specifically, when the alleged procedural violation is the government's failure to prepare an EIS, the Court continued, standing is based on "whether appellants have shown a particularized environmental interest of theirs that will suffer demonstrably increased risk." *Id.* at 665.

Under that rather stringent standard, the Court of Appeals concluded that appellants lacked standing because they premised their claims of environmental injury and causation "on a lengthy chain of conjecture." *Id.* at 666. In other words, the appellants failed to show how the alleged increased crop production would cause a "demonstrably increased risk of serious environmental harm," *id.* at 667, that would actually threaten their "particular interests." *Id.*

■ Applying the principles of *Florida Audubon* to this case, it is clear that Plaintiffs do not establish standing on the basis of their procedural rights under NEPA and

---

**12.** ETBE is derived from, but does not contain, ethanol.

NFMA. Procedural violations alone of those statutes are insufficient to grant Plaintiffs standing. *Id.* at 664. More to the point, Plaintiffs cannot show the requisite "demonstrably increased risk of environmental harm," *id.* at 667, that actually threatens their particular interest.

Plaintiffs' claimed environmental interest is a healthy forest that will "provide for current and sustained timber production." Plt.Brf. at 44. Their alleged injury is that the Interim Guidelines will adversely affect forest health because they will cause disease and insect infestations and inadequately control forest fires. *See* Complaint ¶ 5, 6, 7, 8, 12. Even assuming that such environmental injury is "particularized" enough under the *Florida Audubon* standard, however, Plaintiffs have clearly failed to show that the Interim Guidelines will cause a "demonstrably increased risk of environmental harm." Indeed, it is far from clear that the Interim Guidelines will damage the environment *at all,* let alone that they will cause a "demonstrably increased risk" of environmental harm. The record shows that the Interim Guidelines will have a number of positive effects: (1) enhance the viability of the spotted owl population, *see* AR at 357–60, 619, 627–29; (2) provide for more "late-successional" (i.e. old growth) habitats, which will benefit numerous species associated with older forests, *see* AR at 412–414; (3) give more benefits to the watershed, soils and fisheries resource, AR at 417; and (4) provide higher visual quality, AR at 419. Furthermore, the Forest Service has concluded, contrary to Plaintiffs' contentions, that the Interim Guidelines will *reduce,* not increase, the risk of wildfires. AR at 620–621.

■ Moreover, Plaintiffs' alleged environmental harm depends largely upon speculations about the natural course of forest development. For example, Plaintiffs' argument that the Interim Guidelines will cause greater disease in the forest assumes a number of causal links and ignores the fact that greater disease could occur in the forest even without the Interim Guidelines in place. Our Court of Appeals has set forth a stringent standard: the Government's action must lead to a "*demonstrably* increased risk," *id.* at 667 (emphasis added), of environmental harm. An EIS requirement does not

> provide individuals who can demonstrate no more than "probable cause" of some risk of environmental injury from federal agency action a means of forcing the agency to discover whether its action, in fact, poses any actual risk of causing such harm.

*Id.* at 669 n. 5

The Court concludes that Plaintiffs do not meet our Circuit's recently announced test in *Florida Audubon.* While the Plaintiffs undoubtedly have procedural rights, they have failed to show a "particularized environmental interest of theirs that will suffer demonstrably increased risk." *Id.* at 665.

Accordingly, Plaintiffs have not established the "irreducible constitutional minimum," *Defenders,* 504 U.S. at 558, 112 S.Ct. at 2135, necessary for standing, and Plaintiffs are not proper parties before the Court. The Government's Motion for Summary Judgment must, therefore, be granted for that reason.

## B. The Prudential "Zone of Interest" Test

■ Even assuming that Plaintiffs could establish constitutional standing, the Court also concludes that they lack standing under NEPA under the Supreme Court's "zone of interest" test. A plaintiff seeking judicial review of an agency action under the APA "must establish that the injury he complains of . . . falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (*citing Clarke v. Securities Industry Ass'n.,* 479 U.S. 388, 396–97, 107 S.Ct. 750, 755–57, 93 L.Ed.2d 757 (1987)). The test, established by the Supreme Court in *Association of Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829, requires that we ask whether a would-be challenger of agency action is pursuing an interest "arguably within the zone of interests" Congress intended either to regulate or to protect. *Id.* at 153, 90 S.Ct. at 829. The purpose of the zone of interest inquiry is "to exclude those plaintiffs whose suits are more

likely to frustrate than to further statutory objectives." *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. A plaintiff whose interests are "marginally related to or inconsistent with the purposes implicit in the statute" lacks standing to sue. *Id.* at 399, 107 S.Ct. at 757. For the reasons discussed below, the Courts finds that Plaintiffs fall outside NEPA's zone of interests.

NEPA was enacted "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. The Supreme Court has defined NEPA's zone of interest as the "physical environment—the world around us so to speak." *Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 772, 103 S.Ct. 1556, 1560, 75 L.Ed.2d 534 (1983). Thus, our Court of Appeals has said that to have standing under NEPA, a plaintiff must allege an "environmental harm." *Competitive Enterprise Institute v. NHTSA,* 901 F.2d 107, 124 (D.C.Cir.1990) (standing denied under NEPA's zone of interest test because petitioners' "real concern [was] receiving and disseminating adequate information about highway safety as it may be affected by fuel economy standards, not with receiving and disseminating information on the environmental consequences of those standards.").

 A plaintiff who asserts solely economic injuries does not have standing under NEPA. *Mountain States,* 92 F.3d at 1236 (NEPA's zone of interests does "not include purely monetary interests, such as the competitive effect that a construction project might have on plaintiff's commercial enterprise"); *see also Realty Income Trust v. Eckerd,* 564 F.2d 447, 452 (D.C.Cir.1977) ("Certainly an allegation of injury to monetary interest alone may not bring a party within the zone of environmental interests as contemplated by NEPA."); *Trinity County Concerned Citizens et al. v. Babbitt,* Civ. Action No. 92–1194, 1993 WL 650393, at *6 (D.D.C. Sept. 20, 1993) ("economic injuries

are not within NEPA's zone of interests").[13] Nonetheless, a plaintiff's economic interests "do not blight his qualifying ones, such as aesthetic and environmental interests in the quality of public lands." *Mountain States,* 92 F.3d at 1236.

The decision of our Court of Appeals in *Hazardous Waste Treatment Council v. Thomas,* 885 F.2d 918 (D.C.Cir.1989) (*"HWTC IV"*) guides our analysis. In *HWTC IV,* an organization of companies that treated hazardous waste and then marketed products derived from that waste sued under the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901–2992k, to force the EPA to adopt stricter environmental regulations for other companies. The Court of Appeals held that the organization failed the zone of interest test because its members' interests were not "systematically" aligned with those of the statute. *HWTC IV,* 885 F.2d at 924. The court noted that the treatment firms' interests were " 'more likely to frustrate than further statutory objectives.' ". *Id.* at 925 (quoting *Clarke,* 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12). Since the

> ultimate interest of those firms [was] in making money, ... there [was] not the slightest reason to think that [their] interest in getting more revenue by increasing the demand for their particular treatment services [would] serve [the statutes'] purpose of protecting health and the environment.

885 F.2d at 924. Their interest, the court concluded, was "to pursue regulation that encourages the alternatives with the greatest profit potential [for them] at the expense of others (say, recycling or incineration) that might be less profitable." *Id.* at 924–25. Because this interest was not "systematically" aligned with the statute's purpose of protecting health and the environment, the

---

**13.** *See also Nevada Land Action Ass'n v. United States Forest Service,* 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Breckinridge v. Rumsfeld,* 537 F.2d 864, 867 (6th Cir.

1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977) ("Environmental goals and policies [of NEPA] were never intended to reach social problems [layoffs] such as those presented here").

court concluded that the companies lacked standing.[14]

*HWTC IV* directly governs this case. As in *HWTC IV*, the Plaintiffs here are more "likely to frustrate than further statutory objectives." *Clarke*, 479 U.S. at 397 n. 12, 107 S.Ct. at 756 n. 12. Plaintiffs' ultimate interest is in securing the adoption of a Forest Service plan that maximizes the number of trees they are allowed to harvest from the forest. *See e.g.*, Complaint ¶¶ 7, 8, 11, 12 (alleging that the CASPO decision has had adverse effects on the availability of timber "and will undermine the economic and social fabric of local communities"). Under the clear holding of *HWTC IV*, that interest is not "systematically" aligned with NEPA's purpose, to "prevent or eliminate damage to the environment." 42 U.S.C. § 4321.

While Plaintiffs also assert that the Interim Guidelines will adversely affect forest health, *see e.g.*, Complaint ¶¶ 5, 6, 7, 8, 12 (alleging that, *inter alia*, "disease and insect infestations and catastrophic fires are inadequately controlled" under the Interim Guidelines), their alleged concern for the health of the forest is no more credible than the waste treatment companies' concern for protecting health and the environment alleged in *HWTC IV*. Indeed, Plaintiffs admit that their environmental interest in maintaining healthy forests is to "provide for current and sustained timber production." Plt.Brf. at 44. Plaintiffs' interests must be "systematically, not fortuitously" or "accidentally" aligned with those that "Congress sought to protect." *HWTC IV*, 885 F.2d at 924–25.[15]

Moreover, Plaintiffs have pointed to nothing that differentiates them from the plaintiffs in *Trinity County Concerned Citizens*, *supra*, a case from a district court in this circuit factually similar to this case, which held that the plaintiffs lacked standing under NEPA.

In *Trinity County, supra*, private organizations and individuals alleging economic injuries from logging reductions challenged under NEPA a federal decision to designate critical habitat for the northern spotted owl. Plaintiffs also claimed, as they do here, that in addition to economic injuries, the agency action would "harm the health of the forest by subjecting it to an increased risk of fire," thereby causing environmental injury. 1993 WL 650393 at *5. Judge Norma Holloway Johnson rejected this argument, however, finding "that plaintiffs' attempt to articulate concern for the health of the forest is in fact no more than an economic injury in disguise." *Id.* at *6. The court ruled that the alleged harm fell outside NEPA's zone of interests and that plaintiffs therefore lacked standing.

█ In summary, the Court concludes that Plaintiffs lack standing under NEPA's prudential zone of interest test. The timber companies have "interests that [are] fundamentally inconsistent with the interests Congress had in mind when it enacted the statute." *HWTC IV*, 885 F.2d at 927. Our Circuit's decision in *HWTC IV* is clear, controlling precedent, and *Trinity County* is directly on point and persuasively reasoned. The timber industry is a "peculiarly *un*suitable proxy for those whom Congress intended to protect, and is therefore not within the zone of interests." *HWTC IV*, 885 F.2d at 927 (emphasis in original).[16]

---

14. The Court of Appeals just recently affirmed the holding and reasoning of *HWTC IV* in *Scheduled Airlines Traffic Offices, Inc. v. Dept. of Defense*, 87 F.3d 1356 (D.C.Cir.1996). In *Scheduled Airlines*, the Court of Appeals applied the *HWTC IV* standard, and concluded that appellants in that case satisfied the zone of interest test because their interests were "sufficiently congruent" with those of the statute at issue. *Id.* at 8 (quoting *First National Bank v. National Credit Union*, 988 F.2d 1272, 1275 (D.C.Cir. 1992)).

15. Our Court of Appeals provided little guidance on whether the "environmental interest" in maintaining a healthy forest for logging purposes is sufficient to confer standing. In *Mountain States, supra*, the Court declined to address whether plaintiffs would have NEPA standing "on the ground that its increase in wildfire risk (which is surely "environmental") impinges on their logging interest." *Id.* at 1236.

16. This conclusion also applies to Amador County. Whether the County is suing as *parens patriae* or, as Plaintiffs maintain, to vindicate its own property interest, the County falls outside of NEPA's zone of interests. As the Plaintiffs plainly admit, Amador County is suing primarily because the Interim Guidelines will cause "adverse impact on employment in timber-dependent communities [and] will diminish the County's tax

### III. *Conclusion*

For the reasons discussed above, the Court concludes that Plaintiffs lack standing to bring this suit under both the constitutional and prudential zone of interest tests. Accordingly, Defendants' Motion for Summary Judgment is **granted.**

An Order will issue with this Opinion.

base and put a strain on the County's ability to provide goods and services for its citizens." Plt.Reply at 21. Because that interest is essentially derivative of timber interests, it too is in-

consistent with NEPA's purpose of "prevent[ing] or eliminat[ing] damage to the environment." 42 U.S.C. § 4321.